OPINION
ADKINS, J.
STATEMENT
This suit is filed by four retail distributors of gasoline at Detroit against Harold L. Ickes, Secretary of the Interior and Administrator of the Code of Fair Competition for the Petroleum Industry.
The amended bill alleges that each of the plaintiffs is engaged in the distribution of oil and petroleum; that they do a purely local intrastate business of selling their products at their service stations and otherwise; that they established a business which is lawful under the laws of Michigan of giving coupons to customers redeemable in merchandise, usually glassware and earthenware.
They allege that on August 19, 1933, the President approved the Code of Fair Competition for the Petroleum In *60 dustry, and on September 13, 1933, approved certain modifications thereof. Rule 17 of Art. Y provides—
“Except by permission of the Planning and Coordination Committee, refiners, distributors, jobbers, wholesalers, retailers, and others engaged in the sale of petroleum products shall not give away oil, premiums, trading stamps, free goods, or other things of value, or grant any special inducement in connection with the sale of petroleum products.”
Plaintiffs allege that the defendant interprets this rule as applicable to their business, and that under such interpretation the rule and the National Recovery Act are unconstitutional because they interfere with the intrastate business of the plaintiffs.
Section 3 (f) of the National Recovery Act authorizes the imposition of a fine of not more than $500 for any violation of a code of fair competition “in any transaction in or affecting interstate or foreign commerce.”
Plaintiffs allege that defendant as Administrator of the Code of Fair Coinpetition for the Petroleum Industry has informed plaintiffs that unless they desist from issuing and redeeming coupons he will have them prosecuted for violating the National Recovery Act.
Plaintiffs also allege that their competitors give free parking space with the sale of gasoline, and give maps and spend large sums in advertising; that plaintiffs’ system of giving premiums is a method of advertising; that the defendant’s conduct is arbitrary and capricious, and does not constitute due process of law because he does not intend to prosecute their competitors for the things above mentioned, and thereby discriminates against plaintiffs.
Plaintiffs pray that defendant may be enjoined from interfering with their business and from attempting to have them prosecuted under the act or under the code.
A rule was issued requiring defendant to show cause why he should not be enjoined as prayed.
*61 Defendant filed an answer to the rule, and a motion to dismiss the bill of complaint.
In his answer to the rule defendant says that the practice of giving premiums has been indulged in by certain gas filling stations in Michigan in the past and has resulted immediately in direct price cutting by competing dealers; that this resulting price cutting war has spread in widening circles and frequently across state lines; that there has resulted diminution and dislocation of interstate commerce;, that some retailers diverted their purchase of petroleum products to cheap foreign markets in order to buy gasoline at prices sufficiently low to enable them to continue price cutting and stay in business; that the price cutting was extended back to refiners and producers and brought about a serious and widespread dislocation of business among refiners and a serious impairment and obstruction to the normal flow of gasoline in interstate commerce (par. 5);
That the practice has in many instances compelled retail dealers to go out of business (par. 7);
That the practice has resulted in encouraging certain refiners to use inexpensive and insufficient methods of treating crude oil, thereby causing a waste of an important and exhaustible natural resource of the nation (par. 9);
That the conduct of the petroleum business by the use of such methods seriously and adversely affected for several years past the whole of the petroleum industry in the United States resulting not only in drastic price wars but in reduction of wages, growth of unemployment, and waste of an exhaustible natural resource, all of which affected interstate commerce not only in petroleum and its products but in general;
That the petroleum industry is one of the largest in the United States, furnishing employment to hundreds of thousands of persons; that a substantial portion of the people of the nation are directly interested financially in said industry, *62 including production, refining, distributing and marketing of petroleum and its products; said industry is the third largest in the nation; it employs directly hundreds of thousands of wage earners and indirectly contributes to the employment of many other persons; it is a large user of the interstate transportation facilities of the nation; that its products in crude and refined form are transported to practically every town in the United States (par. 10).
The answer is accompanied by numerous affidavits signed by hundreds of men engaged in some branch of the petroleum industry and in some form of interstate commerce in petroleum products between Michigan and other states and also in the retail distribution of such products in Michigan.
Some of the affiants are officers of oil companies engaged in business throughout a substantial portion of all of the nation. Hundreds of affiants are distributors in Detroit or other Michigan cities.
These affidavits overwhelmingly support the answer above summarized.
From the affidavits it appears that the great bulk of gasoline used in Michigan comes from other states of the Union.
In 1931, 1932 and the early part of 1933 there were severe and drastic price wars in Detroit and other Michigan cities. The affidavits give a vivid picture of the origin, duration and effect of some of these wars.
One war was brought about by the fact that a competitor of the Sunny Service Oil Company inaugurated a system of giving premiums with gasoline. This form of price cutting is difficult to meet because no one else knows the cost of the premium the dealer is giving. The Sunny Service Oil Company met this competition by reducing prices, and other competitors were compelled to do likewise. This war was so severe that sixteen distributors in Detroit were driven into bankruptcy.
*63 The Sunny Service Oil Company distributes more gasoline to the public than any other single retail marketer in Detroit. In order to continue price cutting and stay in business it was compelled to purchase low-priced gasoline from abroad and import the same into this country. An effect of this war was to substantially restrain the flow of gasoline from other states of the Union into Michigan and to substitute for many millions of gallons of such gasoline the cheap gasoline imported from abroad.
One of the companies forced out of business, the Middleton Oil Company, had distributed in Michigan approximately two and one-half millions of gallons of gasoline per year purchased from refiners in Indiana.
During this war the business of the White Star Refining Company which operated two refineries in Michigan was so adversely affected that it sold one of its refineries, and the purchaser later was compelled to shut down the refinery. This refinery in three months of 1931 ran 520,000 barrels of oil, all of which moved in interstate commerce.
Other Michigan cities suffered in the same way as Detroit, with the corresponding effect upon interstate commerce.
One affiant thus graphically describes the effect of the giving of premiums in Ann Arbor. On March 2, 1933, affiant’s company announced in the press that it would give free a jigsaw puzzle with each five gallons of gasoline purchased at its stations on March 4 and 5. The next day two competitors announced a cut of two cents a gallon, and on the following day two national distributors announced the same reduction. Thereupon affiant announced a discount of two cents a gallon plus a jig-saw puzzle. Before that day was over practically all distributors, one after another, increased the discount to four cents a gallon. Fortunately the originator had promised his premium for only two days and on March 6 all distributors restored their original prices without discount or gifts of any kind.
*64 From the evidence I find as a fact that the practice of giving premiums with the sale of gasoline in intrastate commerce in Detroit has imposed a direct burden upon interstate commerce and the necessary effect of such a practice is to substantially and unduly obstruct the interstate commerce between Michigan and other states in gasoline and substantially to reduce the amount of such interstate commerce.
STATUTE
The question in this case is whether the giving of premiums by plaintiffs with their sales of gasoline in intrastate commerce may be regulated or prohibited by Congress because of its effect upon interstate commerce in gasoline.
In my opinion the answer depends upon the commerce clause of the Constitution. It is sufficient to state that part of the National Recovery Act which purports to be based on this clause.
The National Industrial Recovery Act of June 16, 1933, is divided into three titles. The first, Industrial Recovery, has ten sections. We are concerned with sections 1 to 7.
Section 1 is a declaration of policy.
It declares the existence of a national emergency productive of widespread unemployment and disorganization of industry, which burdens interstate and foreign commerce. It is hereby declared to be the policy of Congress to remove obstructions to the free flow of interstate and foreign commerce which tend to diminish the amount thereof and to provide for the general welfare, (and there follows the statement of many things to be accomplished, including the elimination of unfair competitive practices).
. Section 2 provides for the administrative agencies for the enforcement of the law, and limits the existence of the title to two years, unless the President or Congress shall sooner declare that the emergency recognized by section 1 has ended.
*65 Section 3 provides for the approval by the President of a Code of fair competition for a trade or industry or subdivision thereof.
Under 3(a) the President’s approval may be given upon the voluntary application of a trade or industrial association or group.
After the President shall have approved any such Code its provisions shall be the standards of fair competition for such trade or industry (3(b)).
Any violation of such standards in any transaction in or affecting interstate or foreign commerce shall be deemed an unfair method of competition within the meaning of the Federal Trade Commission act.
(3c) gives jurisdiction to the district courts of the United States to restrain violations of any Code of fair competition.
Paragraph (d) authorizes the President, upon certain complaint made to him, and if there has been no voluntary application, to prescribe and approve a Code of fair competition for a trade or industry, and it shall have the same effect as a Code approved on the application of the trade or industry.
Section 7 prescribes certain things which must be included in every Code of fair competition; they deal principally with labor.
Section 5(f) provides that when a Code of fair competition has been approved (under paragraph a) or prescribed (under paragraph d), any violation of any provision thereof in any transaction in or affecting interstate commerce shall be a misdemeanor, subject to a fine of not more than $500, and that each day such violation continues shall be a separate offense.
The act undertakes to confer several advantages upon those who comply with its provisions, in addition to those advantages flowing from the Codes of fair competition themselves.
Under section 3(e), upon complaint from persons who *66 have complied with the provisions of this title, the President may limit the importation of articles, or prescribe the terms of importation of articles, the importation of which may tend to render ineffective any code or agreement made under this title.
Under section 5 the codes shall be exempt from the provisions of the antitrust laws of the United States.
Section 303 provides — “If any provision of this Act, or the application thereof to any person or circumstances, is held invalid, the remainder of the Act, and the application of such provision to other persons or circumstances, shall not be affected thereby.”
The Code of Fair Competition in the Petroleum Industry was approved by the President August 19, 1933, upon the application of a number of groups in the industry. It was modified September 13, 1933.
The Code is divided into seven articles. Art. V, dealing with marketing, contains thirty-one rules. Rule 17, which forbids the giving of premiums with the sale of gasoline, has already been set forth.
OPINION
1. The National Industrial Recovery Act does not delegate legislative power to the President.
Plaintiffs’ attorney does not contend to the contrary; therefore the discussion of this point may be brief.
Section 3 of the Act authorizes the President to approve codes of fair competition for a particular trade or industry or subdivision thereof; after such code is approved the provisions thereof shall be standards of fair competition for that trade; any violation of such standards in any transaction in or affecting interstate or foreign commerce shall be deemed an unfair method of competition in commerce within the meaning of the Federal Trade Commission act.
*67 The language used in section 5 of that act is “unfair methods of competition."
An attack was made on that statute as being too indefinite and as constituting an unconstitutional delegation of power to the Commission. In Sears Roebuck & Co. v. Federal Trade Comm., 258 Fed. 307, the Court of Appeals for the 7th Circuit, after holding the language “unfair methods of competition" to be sufficiently definite, said:
“Grants of similar authority to administrative officers and bodies, have not been foünd repugnant to the Constitution. Buttfield v. Stranahan, 192 U.S. 470, 24 Sup. Ct. 349, 48 L.Ed. 525; Union Bridge Co. v. United States, 204 U.S. 365, 27 Sup. Ct. 367, 51 L.Ed. 523; Penn. Rid. Co. v. International Coal Co., 230 U.S. 184, 33 Sup. Ct. 893, 57 L.Ed. 1446, Ann. Cas. 1915D, 315; National Pole Co. v. Chicago & N.W. Ry. Co., 211 Fed. 65, 127 C.C.A. 561.
“With the increasing complexity of human activities many situations arise where governmental control can be secured only by the ‘board’ or ‘commission’ form of legislation. In such instances Congress declares the public policy, fixes the general principles that are to control, and charges an' administrative body with the duty of ascertaining within particular fields from time to time the facts which bring into play the principles established by Congress. Though the action of the Commission in finding the facts and declaring them to be specific offenses of the character embraced within the general definition by Congress may be deemed to be quasi legislative, it is so only in the sense that it converts the actual legislation from a static into a dynamic condition. But the converter is not the electricity. And though the action of the commission in ordering desistance may be counted quasi judicial on account of its form, with respect to power it is not judicial, because a judicial determination is only that which is embodied in a judgment or decree of a court and enforceable by execution or other writ of the court.” (311, 312)
In Frischer v. Elting, 60 F(2d)711, certiorari denied 287 U.S. 649, the Court of Appeals for the 2nd Circuit upheld the constitutionality of section 316 of the Tariff Act of 1922, *68 which authorized the President to increase duties or impose an embargo upon imports which he considered were in unfair competition with domestic products.
In Hampton Co. v. U.S., 276 U.S. 394, the Supreme Court sustained the validity of section 315 of thé same Tariff Act which directs the President to increase or decrease duties so as to equalize the difference which upon investigation he finds between the costs of producing at home and in competing foreign countries the kinds of articles to which the duties apply. Mr. Chief Justice Taft in his opinion discusses the subject at length.
In his opinion in the cases of United States v. Campbell, Campbell v. Medalie, and Campbell v. Chase National Bank District Judge Woolsey sustained the power of the President to make regulations under sections 2 and 3 of Title I of the Act of March 9, 1933 (New York Journal, November 17, 1933, p. 1814). His opinion contains an excellent discussion of the authorities.
A similar provision in the Agricultural Adjustment Act was sustained by St. Sure, District Judge, on October 2, 1933, in United States and Henry A. Wallace, Secretary of Agriculture v. Calistan Packers, Inc., in the United States District Court for the Northern District of California.
2. Upon the record it must be held that plaintiffs’ method of doing business constitutes a method of unfair competition forbidden by Rule 17 of the Code, and that said Rule is not a violation of the due process clause.
Counsel for plaintiffs contends that the giving of premiums is simply a form of advertising and cannot be held to constitute unfair competition.
As far back as February 17, 1873, Congress by “An Act prohibiting gift enterprises in the District of Columbia” (17 *69 Stat. 464) made unlawful in the District of Columbia a business similar to that carried on by plaintiffs. The Court of Appeals held that statute valid in Lansburgh v. D. C., 11 App. D. C. 512.
In Rast v. Van Deman, 240 U.S. 342, the Supreme Court held that a Florida statute imposing prohibitory license taxes upon merchants selling goods in conjunction with trading stamps or premium coupons was valid and not an infringement of the due process clause. The Court overruled contentions similar to those made by plaintiffs here. The Court said — (365)
“But no refinement of reason is necessary to demonstrate the broad power of the legislature over the transactions of men. There are many lawful restrictions upon liberty of contract and business. It would be an endless task to cite cases in demonstration, and that the supplementing of the sale of one article by a token given and to be redeemed in some other article has accompaniments and effects beyond mere advertising the allegations of the bill and the argument of counsel establish. Advertising is merely identification and description, apprising of quality and place. It has no other object than to draw attention to the article to be sold, and the acquisition of the article to be sold constitutes the only inducement to its purchase. The matter is simple, single in purpose and motive; its consequences are well defined, there being nothing ulterior; it is the practice of old and familiar transactions and has sufficed for their success.
“The schemes of complainants have no such directness and effect. They rely upon something else than the article sold. They tempt by a promise of a value greater than that article and apparently not represented in its price, and it hence may be thought that thus by an appeal to cupidity lure to improvidence. This may not be called in an exact sense a ‘lottery/ may not be called ‘gaming’; it may, however, be considered as having the seduction and evil of such, and whether it has may be a matter of inquiry, a matter of inquiry and of judgment that it is finally within the power of the legislature to make. Certainly in the first instance, and, as we have seen, its judgment is not impeached by urging against it a difference *70 of opinion. Chic. Burl. & Quincy R. R. v. McGuire and German Alliance Ins. Co. v. Kansas, supra. And it is not required that we should be sure as to the precise reasons for such judgment or that we should certainly know them or be convinced of the wisdom of the legislation. Southwestern Oil Co. v. Texas, 217 U. S. 114, 126, 127. See also Munn v. Illinois, 94 U. S. 113, 132.”
This disposes of the plaintiffs’ contention that the enforcement of Rule 17 against them is arbitrary and capricious because their rivals are giving free parking space with the sale of gasoline, and are giving maps and advertising in newspapers.
At the argument counsel for the Planning and Coordination Committee created by the Petroleum Code stated that the giving of free parking space was a violation of the Rule, and that steps would be taken to stop it by prosecution or otherwise.
The giving of maps is but one form of advertising. Maps and other road information are freely given by filling stations to any motorist whether he makes purchases or not. I think the practice is so widespread that I may take judicial notice of it.
In Rast v. Van Deman the Supreme Court also holds that the regulation and even prohibition of the business there involved was not in violation of the due process clause (p. 368).
In Highland v. Russell Car Co., 279 U. S. 263, the Supreme Court in speaking of the freedom of the people to make contracts in respect of their property and private affairs said:
“It is also well established by the decisions of this court that such liberty is not absolute or universal, and that Congress may regulate the making and performance of such contracts whenever reasonably necessary to effect any of the great purposes for which the national government was created.”
*71 3. The giving of premiums by plaintiffs with their sales of gasoline in intrastate commerce may be prohibited by Congress because of its effect upon interstate commerce in petroleum products.
Upon the evidence I have found that the practice of plaintiffs imposes a direct burden upon interstate commerce in petroleum products and substantially and unduly obstructs the free flow of such commerce between Michigan and other states of the Union, and substantially and unduly diminishes the amount of such interstate commerce.
Clause 3, section 8, Art. I of the Constitution provides—
“The Congress shall have power. ... To regulate commerce with foreign nations and among the several states.”
In Houston & Texas Ry. Co. v. U. S., 234 U. S. 342, (The Shreveport case), the complaint was that the railroads made rates out of Dallas and other Texas points into eastern Texas which were much lower than the rates which they extended into Texas from Shreveport.
In discussing the power of Congress under the interstate commerce clause the present Chief Justice said (p. 351)—
“Congress is empowered to regulate — that is, to provide the law for the government of interstate commerce; to enact ‘all appropriate legislation’ for its ‘protection and advancement’ (The Daniel Ball, 10 Wall. 557, 564): to adopt measures ‘to promote its growth and insure its safety’ (County of Mobile v. Kimball, 102 U. S. 691, 697); ‘to foster, protect, control and restrain’ (Second Employers’ Liability Cases, 223 U. S. 1, 54)”
The Court held that Congress has power to control the intrastate commerce carried by the railroads to the extent necessary to prevent injurious discrimination against interstate traffic. The Court continued—
“The fact that carriers are instruments of intrastate commerce, as well as of interstate commerce, does not derogate *72 from the complete and paramount authority of Congress over the latter or preclude the Federal power from being exerted to prevent the intrastate operations of such carriers from being made a means of injury to that which has been confided to Federal care. Wherever the interstate and intrastate transactions of carriers are so related that the government of the one involves the control of the other, it is Congress, and not the State, that is entitled to prescribe the final and dominant rule, for otherwise Congress would be denied the exercise of its constitutional authority and the State, and not the Nation, would be supreme within the national field. Baltimore & Ohio Railroad Co. v. Interstate Commerce Commission, 221 U. S. 612, 618; Southern Railway Co. v. United States, 222 U. S. 20, 26, 27; Second Employers’ Liability Cases, supra, pp. 48, 51; Interstate Commerce Commission v. Goodrich Transit Co., 224 U. S. 194, 205, 213; Minnesota Rate Cases, supra, p. 431; Illinois Central Railroad Co. v. Bohrens, 233 U. S. 473” (pp. 331-2).
The cases dealing with the control by Congress over the business of the railroads engaged in interstate commerce are innumerable. They uphold the right of Congress to regulate rates, equipment, methods of bookkeeping and other matters dealing both with intrastate as well as interstate commerce. Usually the intrastate business of the carriers is so mixed with their interstate business that it is not difficult to see the effect of the local business upon the interstate business.
In the Shreveport case it was held that Congress might authorize the fixing of rates in local commerce between Texas cities because the carriers’ rates gave the Texas cities an advantage and preference over Shreveport in Louisiana. Clearly this was a regulation of intrastate commerce solely because it diminished the interstate commerce between Shreveport and Texas. Logically it is difficult to distinguish that case from the present one.
The cases of Swift & Co. v. U. S., 196 U. S. 375, and Stafford v. Wallace, 258 U. S. 495, are directly in point and sustain the validity of Rule 17.
*73 Both cases deal with the meat-packing industry. The Swift case involved a bill in equity filed by the United States resulting in a decree enjoining the packers from violating the Sherman law in certain respects named.
In Stafford v. Wallace the constitutionality of the Packers and Stockyards Act of 1921 was involved.
In the Swift case the Supreme Court found that there is a steady flow of commerce from the western states to the east in cattle, the flow of commerce being interrupted at the stockyards for the purpose of finding purchasers for the cattle, some of the cattle being slaughtered at the stockyards and the bulk of the meat products therefrom continuing in interstate commerce to eastern states, while other cattle went back to the range for fattening. The Court held that the acts of commissionmen and dealers in purchasing these cattle when they stopped at the stockyards were incident to interstate commerce, and that the combination of the packers being illegal under the Sherman law, the fact that the acts of the commissionmen and dealers were local and intrastate would not prevent an injunction against the combination.
The Packers and Stockyards Act of 1921 provides for the supervision by Federal authority of the business of the packers and commissionmen and livestock dealers in the great stock yards of the country. It seeks to regulate the business of the packers and forbids their engaging in unfair or discriminatory and deceptive practices. The act also requires that all rates and charges for services and facilities in the stockyards and all practices in connection with the livestock passing through the yards shall be just, reasonable, nondiscriminatory and nondeceptive. The Secretary of Agriculture is given authority to determine the justice, reasonableness and nondiscriminatory or nondeceptive character of every charge and practice, and to fix rates.
The object of the act is the free and unburdened flow of livestock from the ranges and farms through the great stock *74 yards, and thence in the form of meat products to the consuming cities of the country. Congress thought that the control was necessary in order to prevent a monopoly of the packers. Another evil which it sought to> provide against was exorbitant charges, duplication of commissions, deceptive practices in respect of prices in the passage by the livestock through the stockyards.
Following its decision in the Swift case the Supreme Court in an opinion by Chief Justice Taft sustained the constitutionality of this statute. As to the commissionmen and dealers at the stockyards whose transactions were local and intrastate the court found that their functions did not interrupt the current of the commerce but were indispensable to its continuity. The Court said—
“The only question here is whether the business done in the stockyards between the receipt of the live stock in the yards and the shipment of them therefrom is a part of interstate commerce or is so associated with it as to bring it within the power of national regulation” (517).
After quoting at length from the Swift case the Court continued—
“The application of the commerce clause of the Constitution in the Swift case was the result of the natural development of interstate commerce under modern conditions. It was the inevitable recognition of the great central fact that such streams of commerce from one part of the country to another which are ever flowing are in their very essence the commerce among the States and with foreign nations which historically it was one of the chief purposes of the Constitution to bring under national protection and control. This court declined to defeat this purpose in respect of such a stream and take it out of complete national regulation by a nice and technical inquiry into the non-interstate character of some of its necessary incidents and facilities when considered alone and without reference to their association with the movement of which they were an essential but subordinate part.”
*75 The petroleum industry is the third largest in this country. The great bulk of gasoline does flow in interstate commerce. The function of filling stations is as essential to that flow as is the function of the commissionmen and dealers in the packing industry at the stockyards.
The only difference of fact is that the intrastate function is performed during the various steps in the interstate commerce and while cattle are being processed for sale to the consumers; while in the present case the function of the distributors is performed after interstate commerce has concluded.
But the principle is the same in both cases. The intrastate acts come within Congressional control if they substantially affect interstate commerce.
The Circuit Court of Appeals for the 2nd Circuit in Greater New York Life Poultry Chamber of Commerce v. U. S., 47 F. (2d) 156, 158, discussing the Swift and Stafford cases, said—
“We do not believe that the result would have been different had the steers shipped from the west to Chicago been bought for butchering and sale in the Chicago market.”
The decisions of' the Supreme Court involving the Future Trading Act of August 24, 1921 and the Grain Futures Act of September 21, 1922 also are directly in point in the present case. The first of these cases was decided on the same day as the Child Labor Tax Case and discusses and explains Hammer v. Dagenhart, the first child labor case.
Since the two child labor law cases are relied upon in support of the contention that the National Industrial Recovery Act is unconstitutional, this is an appropriate place to discuss those cases.
Hammer v. Dagenhart, 247 U. S. 251, decided in 1918, held unconstitutional the Act of September 1, 1916 which prohibits transportation' in interstate commerce of goods made at a factory in which, within thirty days prior to their removal *76 therefrom, children under certain ages had been employed or permitted to work more than eight hours a day or at night.
In holding the statute unconstitutional the Court said—
“The Act in effect does not regulate transportation among the states but aims to standardize the ages at which children may be employed in mining and manufacturing within the states. The goods shipped are of themselves harmless. The Act permits them to be freely shipped after thirty days from the time of their removal from the factory” (271, 272).
Nowhere in the opinions or in the argument of counsel is it suggested that the employment of child labor by the factories has any substantial effect upon interstate commerce in the articles so manufactured. The permission to ship those articles thirty days after their removal from the factory clearly indicates the contrary. The Court also said — (273)
“It is further contended that the authority of Congress may be exerted to control interstate commerce in the shipment of child-made goods because of the effect of the circulation of such goods in other States where the evil of this class of labor has been recognized by local legislation, and the right to thus employ child labor has been more rigorously restrained than in the state of production. In other words, that the unfair competition, thus engendered, may be controlled by closing the channels of interstate commerce to manufacturers in those States where the local laws do not meet what Congress deems to be the more just standard of other States.”
There is no suggestion here that this unfair competition burdened, obstructed or diminished the free flow of interstate commerce in goods of the character involved. Counsel for the government, after enumerating the economic and social reasons in support of the law, summed up their contention by the conclusion that the shipment in interstate commerce of the goods made with the aid of child labor operated to deter other states from enacting laws they would otherwise enact for the protection of their own children (254); but counsel did *77 not suggest that the admission to interstate commerce of articles made with the aid of child labor would affect interstate commerce in any degree.
The Revenue Act of February 24, 1919, imposed a tax on manufacturers employing child labor. In the Child Labor Tax Case (259 U. S. 20) the Supreme Court held that this was but an effort to accomplish by virtue of the taxing power the control held unconstitutional in Hammer v. Dagenhart, and that the statute did not undertake to impose a bona fide tax but was an attempt to stop the employment of children within the age limits prescribed (37).
Hill v. Wallace, Secretary of Agriculture, 259 U. S. 44, was decided on the same day as the Child Labor Tax Case, and the opinion was also written by Mr. Chief Justice Taft.
The Act of August 24, 1921, known as the Futures Trading Act, imposed taxes on contracts for the sale of grain for future delivery and provided for the regulation of Boards of Trade. The tax imposed was 20c a bushel on every contract of sale of grain for future delivery. The tax was not imposed upon producers nor upon owners of grain or farmers or on contracts made by or through a member of the Board of Trade designated by the Secretary of Agriculture as a contract market. The Court held that the tax of 20c was a penalty on all sales of futures with the intent to coerce boards of trade and their members into compliance with the statute.
For the reasons stated in the Child Labor Tax Case the Supreme Court held this tax to be unconstitutional under the taxing power. The Court held that the tax could not be sustained under the commerce clause because Congress had not undertaken to impose the tax under that clause and had said nothing from which the Court could conclude that Congress had deemed these transactions to be an obstruction to interstate commerce.
The Court said—
“It follows that sales for future delivery on the Board *78 of Trade are not in and of themselves interstate commerce. .They cannot come within the regulatory power of Congress as such, unless they are regarded by Congress, from the evidence before it, as directly interfering with interstate commerce so as to be an obstruction or a burden thereon.”
Thereafter Congress passed the Grain Futures Act of September 21, 1922. This statute came before the Supreme Court in Board of Trade v. Olsen, 262 U. S. 1.
In an elaborate opinion Mr. Chief Justice Taft discussed the trading in grain and found that there was a steady flow of interstate commerce through Chicago and the other great grain markets quite similar to the flow of cattle and meat described in the Swift and Stafford cases.
The Court found that this statute only purports to regulate intrastate commerce and sales of grain for future delivery on boards of trade because Congress finds that by manipulation such sales have become a constantly recurring burden and obstruction to that commerce.
Like the Swift and Stafford cases the acts of intrastate commerce regulated by the statute occurred between the time the grain left the farm and the time its ultimate product reached the consuming cities. But there was a substantial obstruction to interstate commerce, and for that reason the control of the intrastate commerce was held to be within the power of Congress.
In my opinion it follows from the foregoing decisions of the Supreme Court as applied to the evidence in this case that the action complained of by the plaintiffs is within the power of Congress under the commerce clause of the Constitution. Therefore it becomes unnecessary for me to discuss the other grounds upon which counsel for the defendant contend that the National Recovery Act may be sustained.
The foregoing opinion is supported by recent decisions of a number of trial courts.
*79 Wallace, Secretary of Agriculture v. Caliston Packers, Inc., United States District Court for the Northern District of California, St. Sure, D. J.; Economy Dairy Co. v. Wallace, Secretary of Agriculture, 61 W. L. R. 633, and Capital City Milk Producers’ Association v. Wallace, Equity No. 56113 in this court, opinions by Justice O’Donoghue, all involve the Agricultural Adjustment Act.
Southport Petroleum Co. v. Ickes, Secretary of the Interior, 61 W. L. R. 577, opinion by Justice Cox of this court, and Texas v. Standard Oil Co. et al in the District Court of Texas, at Austin, opinion by Presiding Judge Moore, involve the National’ Industrial Recovery Act.
The oral argument and written briefs in this case were unusually able and thorough, and were of great assistance. I have also derived direct and substantial aid from the article entitled “Some Legal Aspects of the National Industrial Recovery Act,” XLVII Harvard Law Review (November, 1933, p. 85) and from the draft of an article by Professor Robert A. Maurer to be published in the January issue of the Georgetown Law Journal, volume XXII, Issue No. 2, on “Some Constitutional Aspects of the National Industrial Recovery Act and the Agricultural Adjustment Act.”
The motion of the plaintiffs for an injunction is denied, and the motion of the defendant to dismiss the bill of complaint is sustained.