## SINCLAIR *v.* UNITED STATES.

No. 555.   Argued February 18, 19, 1929.—Decided April 8, 1929.

*Messrs. Martin W. Littleton* and *George P. Hoover* for Sinclair.

266

272

*Messrs. Atlee Pomerene* and *Owen J. Roberts* for the United States.

280

MR. JUSTICE BUTLER delivered the opinion of the Court.

Appellant was found guilty of violating R. S., § 102; U. S. C., Tit. 2, § 192. He was sentenced to jail for three months and to pay a fine of $500. The case was taken to the Court of Appeals of the District of Columbia; that court certified to this court certain questions of law upon which it desired instruction for the proper decision of the case. We directed the entire record to be sent up. Judicial Code, § 239, U. S. C., Tit. 28, § 346.

Section 102 follows: "Every person who having been summoned as a witness by the authority of either House of Congress, to give testimony or to produce papers upon any matter under inquiry before either House, or any

committee of either House of Congress, willfully makes default, or who, having appeared, refuses to answer any question pertinent to the question under inquiry, shall be deemed guilty of a misdemeanor, punishable by a fine of not more than $1,000 nor less than $100, and imprisonment in a common jail for not less than one month nor more than twelve months."

By way of inducement the indictment set forth the circumstances leading up to the offense, which in brief substance are as follows:

For many years, there had been progressive diminution of petroleum necessary for the operation of naval vessels; consequently the Government was interested to conserve the supply and especially that in the public domain.

Pursuant to the Act of June 25, 1910, 36 Stat. 847, the President, by executive orders dated September 2, 1912, December 13, 1912, and April 30, 1915, ordered that certain oil and gas bearing lands in California and Wyoming be held for the exclusive use of the navy. These areas were designated Naval Petroleum Reserves 1, 2 and 3, respectively.

The Act of February 25, 1920, 41 Stat. 437, provided for the leasing of public lands containing oil and other minerals. And the Act of June 4, 1920, 41 Stat. 812, directed the Secretary of the Navy to take possession of all properties in the naval reserves " on which there are no pending claims or applications for permits or leases under the " Leasing Act of February 25, 1920, " or pending applications for United States patent under any law," to conserve, develop, use and operate the same by contract, lease or otherwise, and to use, store, exchange or sell the oil and gas products thereof for the benefit of the United States. And it was declared that the rights of any claimants under the Leasing Act were not thereby adversely affected.

May 31, 1921, the President promulgated an executive order purporting to give the administration and conservation of all oil and gas bearing lands in the naval reserves to the Secretary of the Interior subject to supervision by the President.

April 7, 1922, the Secretary of the Navy and the Secretary of the Interior made a lease of lands in Reserve No. 3 to the Mammoth Oil Company. This was done by the procurement of the appellant acting as the president of the company. The lease purported to grant to the company the right to take oil and gas and contained a provision selling royalty oils to the company. And February 9, 1923, a supplemental contract was made by which the company agreed to furnish storage facilities for the Navy. [*Mammoth Oil Company* v. *United States,* 275 U. S. 313.]

April 25, 1922, the same Secretaries made a contract with the Pan American Petroleum and Transport Company for the sale to it of royalty oils from Reserves 1 and 2. December 11, 1922, another contract was made by them. The purpose of these agreements was to arrange that the company furnish storage facilities for the Navy in exchange for royalty oils to be received by the United States under leases then in force and thereafter to be made. December 11, 1922, the same Secretaries made a lease to the Pan American Petroleum Company purporting to grant to it the right to take oil and gas from Reserve No. 1. [*Pan American Co.* v. *United States,* 273 U. S. 456.]

The lease to the Mammoth Company and the contract with the Transport Company came to the attention of the Senate, and it was charged that there had been fraud and bad faith in the making of them. Questions arose as to their legality, the future policy of the Government as to them and similar leases and contracts, and as to the necessity and desirability of legislation upon the subject.

April 29, 1922, the Senate adopted Resolution 282, calling upon the Secretary of the Interior for information and containing the following: " That the Committee on Public Lands and Surveys be authorized to investigate this entire subject of leases upon naval oil reserves with particular reference to the protection of the rights and equities of the Government of the United States and the preservation of its natural resources, and to report its findings and recommendations to the Senate."

June 5, 1922, Resolution 282 was amended by Resolution 294 by adding a provision that the committee " is hereby authorized . . . to require the attendance of witnesses by subpoenas or otherwise; to require the production of books, papers and documents . . . The chairman of the committee, or any member thereof, may administer oaths to witnesses and sign subpoenas for witnesses."

February 5, 1923, the Senate passed Resolution 434, which continued in force and effect until the end of the Sixty-eighth Congress and until otherwise ordered, " Senate Resolution 282 agreed to April 21 [29], 1922, and Senate Resolution 292, agreed to May 15, 1922." [The Government suggests that, instead of the resolution last mentioned there was meant Resolution 294 adopted June 5, 1922.]

February 7, 1924, the Senate passed Resolution 147, directing in substance the same as it had theretofore done by the two resolutions first above mentioned and also that the committee "ascertain what, if any, other or additional legislation may be advisable, and to report its findings and recommendations to the Senate."

The committee proceeded to exercise the authority conferred upon it and for that purpose held hearings at which witnesses were examined and documents produced. Appellant was summoned, appeared and was sworn December 4, 1923.

And the indictment charges that, on March 22, 1924, the matters referred to in these resolutions being under inquiry, and appellant having been summoned to give testimony and having been sworn as aforesaid did appear before the committee as a witness. The first count alleges that Senator Walsh, a member of the committee, propounded to him a question which appellant knew was pertinent to the matters under inquiry: "Mr. Sinclair, I desire to interrogate you about a matter concerning which the committee had no knowledge or reliable information at any time when you had heretofore appeared before the committee and with respect to which you must then have had knowledge. I refer to the testimony given by Mr. Bonfils concerning a contract that you made with him touching the Teapot Dome. I wish you would tell us about that."

And, to explain that question, the indictment states: "said Hon. Thomas J. Walsh thereby meaning and intending, as said Harry F. Sinclair then and there well knew and understood, to elicit from him the said Harry F. Sinclair, facts, which then were within his knowledge, touching the execution and delivery of a certain contract bearing date September 25, 1922, made and executed by and between said Mammoth Oil Company, one F. G. Bonfils and one John Leo Stack, which was executed on behalf of said Mammoth Oil Company by said Harry F. Sinclair as President of said Mammoth Oil Company, and which, among other things, provided for the payment, by said Mammoth Oil Company, unto said F. G. Bonfils and said John Leo Stack, of the sum of $250,000.00, on or before October 15, 1922, in consideration of the release, by said F. G. Bonfils and said John Leo Stack, of rights to lands described in said Executive Order of April 30, 1915, and embraced in the aforesaid lease of April 7, 1922." And that count concluded: "and that said Harry

F. Sinclair then and there unlawfully did refuse to answer said question . . ."

Senate Joint Resolution 54 was approved February 8, 1924. 43 Stat. 5. It recited that the leases and contracts above mentioned were executed under circumstances indicating fraud and corruption, that they were without authority, contrary to law, and in defiance of the settled policy of the Government; and the resolution declared that the lands embraced therein should be recovered and held for the purposes to which they were dedicated. It directed the President to cause suit to be instituted for the cancellation of the leases and contracts, to prosecute such other actions or proceedings, civil and criminal, as were warranted by the facts, and authorized the appointment of special counsel to have charge of the matter.

Prior to March 22, 1924, appellant, at the request of the committee, appeared five times before it, and was sworn as alleged. March 19, 1924, a United States marshal at New York served upon him a telegram, which was in form a subpoena signed by the chairman of the committee, requiring him to appear as a witness; and he did appear on March 22. Before any questions were put, he submitted a statement.

He disclaimed any purpose to invoke protection against self-incrimination and asserted there was nothing in the transaction which could incriminate him. He emphasized his earlier appearances, testimony, production of papers and discharge from further attendance. He called attention to Joint Resolution 54, discussed its provisions, and stated that a suit charging conspiracy and fraud had been commenced against the Mammoth Company and others and that the Government's motion for injunction and receivers had been granted, and that application had been made for a special grand jury to investigate the making

of the lease. He asserted that the committee could not then investigate the matters covered by the authorization because the Senate by the adoption of the joint resolution had exhausted its power and Congress and the President had made the whole matter a judicial question which was determinable only in the courts. The statement concluded: " I shall reserve any evidence I may be able to give for those courts to which you and your colleagues have deliberately referred all questions of which you had any jurisdiction and shall respectfully decline to answer any questions propounded by your committee."

After appellant's statement, his counsel asked the privilege of presenting to the committee reasons why it did not have authority further to take testimony of appellant. In the course of his remarks he said: " Mr. Sinclair is already under oath before the committee. . . . He is on the stand now in every sense of the word, and the objection really is to any further examination of him on the subjects involved in this resolution." Discussion followed, and a motion was made: " That in the examination the inquiry shall not relate to pending controversies before any of the Federal courts in which Mr. Sinclair is a defendant, and which questions would involve his defense." During a colloquy that followed, one of the members said: " Of course we will vote it [the motion] down. . . . If we do not examine Mr. Sinclair about those matters, there is not anything else to examine him about." The motion was voted down. Then the appellant was asked the question set forth in the first count, and he said: " I decline to answer on the advice of counsel on the same ground."

Appellant contends that his demurrer to the several counts of the indictment should have been sustained and that a verdict of not guilty should have been directed. To support that contention he argues that the questions related to his private affairs and to matters cognizable only in the courts wherein they were pending, and that

the committee avowedly had departed from any inquiry in aid of legislation.

He maintains that there was no proof of any authorized inquiry by the committee or that he was legally summoned or sworn or that the questions propounded were pertinent to any inquiry it was authorized to make, and that because of such failure he was entitled to have a verdict directed in his favor.

He insists that the court erred in holding that the question of pertinency was one of law for the court and in not submitting it to the jury and also erred in excluding evidence offered to sustain his refusal to answer.

1. The Committee on Public Lands and Surveys is one of the standing committees of the Senate. No question is raised as to the validity of its organization and existence. Under § 101 of the Revised Statutes, U. S. C., Tit. 2, § 191, its chairman and any of its members are empowered to administer oaths to witnesses before it. Section 102 plainly extends to a case where a person voluntarily appears as a witness without being summoned as well as to the case of one required to attend.

By our opinion in *McGrain* v. *Daugherty*, 273 U. S. 135, 173, decided since the indictment now before us was found, two propositions are definitely laid down: " One, that the two houses of Congress, in their separate relations, possess not only such powers as are expressly granted to them by the Constitution, but such auxiliary powers as are necessary and appropriate to make the express powers effective; and, the other, that neither house is invested with ' general' power to inquire into private affairs and compel disclosures, but only with such limited power of inquiry as is shown to exist when the rule of constitutional interpretation just stated is rightly applied." And that case shows that, while the power of inquiry is an essential and appropriate auxiliary to the legislative function, it must be exerted with due regard

for the rights of witnesses, and that a witness rightfully may refuse to answer where the bounds of the power are exceeded or where the questions asked are not pertinent to the matter under inquiry.

It has always been recognized in this country, and it is well to remember, that few if any of the rights of the people guarded by fundamental law are of greater importance to their happiness and safety than the right to be exempt from all unauthorized, arbitrary or unreasonable inquiries and disclosures in respect of their personal and private affairs. In order to illustrate the purpose of the courts well to uphold the right of privacy, we quote from some of their decisions.

In *Kilbourn* v. *Thompson,* 103 U. S. 168, this court, speaking through Mr. Justice Miller, said (p. 190): ". . . we are sure that no person can be punished for contumacy as a witness before either House, unless his testimony is required in a matter into which that House has jurisdiction to inquire, and we feel equally sure that neither of these bodies possesses the general power of making inquiry into the private affairs of the citizen." And referring to the failure of the authorizing resolution there under consideration to state the purpose of the inquiry (p. 195): "Was it to be simply a fruitless investigation into the personal affairs of individuals? If so, the House of Representatives had no power or authority in the matter more than any other equal number of gentlemen interested for the government of their country. By 'fruitless' we mean that it could result in no valid legislation on the subject to which the inquiry referred."

In *Re Pacific Railway Commission,* (Circuit Court, N. D., California) 32 Fed. 241, Mr. Justice Field, announcing the opinion of the court, said (p. 250): "Of all the rights of the citizen, few are of greater importance or more essential to his peace and happiness than the right of personal security, and that involves, not merely protec-

tion of his person from assault, but exemption of his private affairs, books, and papers from the inspection and scrutiny of others. Without the enjoyment of this right, all other rights would lose half their value." And the learned Justice, referring to *Kilbourn* v. *Thompson, supra,* said (p. 253): "This case will stand for all time as a bulwark against the invasion of the right of the citizen to protection in his private affairs against the unlimited scrutiny of investigation by a congressional committee." And see concurring opinions of Circuit Judge Sawyer, p. 259 at p. 263, and of District Judge Sabin, p. 268 at p. 269.

In *Interstate Commerce Commission* v. *Brimson,* 154 U. S. 447, Mr. Justice Harlan, speaking for the court said (p. 478): "We do not overlook these constitutional limitations which, for the protection of personal rights, must necessarily attend all investigations conducted under the authority of Congress. Neither branch of the legislative department, still less any merely administrative body, established by Congress, possesses, or can be invested with, a general power of making inquiry into the private affairs of the citizen. . . . We said in *Boyd* v. *United States,* 116 U. S. 616, 630,—and it cannot be too often repeated,—that the principles that embody the essence of constitutional liberty and security forbid all invasions on the part of the government and its employés of the sanctity of a man's home and the privacies of his life."

*Harriman* v. *Interstate Commerce Commission,* 211 U. S. 407, illustrates the unwillingness of this court to construe an Act of Congress to authorize any examination of witnesses in respect of their personal affairs. And see *United States* v. *Louisville & Nashville R. R.,* 236 U. S. 318, 335.

In *Federal Trade Commission* v. *American Tobacco Co.,* 264 U. S. 298, this court said (pp. 305–306): "Anyone who respects the spirit as well as the letter of the Fourth

Amendment would be loath to believe that Congress intended to authorize one of its subordinate agencies to sweep all our traditions into the fire (*Interstate Commerce Commission* v. *Brimson,* 154 U. S. 447, 479), and to direct fishing expeditions into private papers on the possibility that they may disclose evidence of crime. We do not discuss the question whether it could do so if it tried, as nothing short of the most explicit language would induce us to attribute to Congress that intent. . . . It is contrary to the first principles of justice to allow a search through all the respondents' records, relevant or irrelevant, in the hope that something will turn up."

. 2. But it is clear that neither the investigation authorized by the Senate resolutions above mentioned nor the question under consideration related merely to appellant's private or personal affairs. Under the Constitution (Art. IV, § 3) Congress has plenary power to dispose of and to make all needful rules and regulations respecting the naval oil reserves, other public lands and property of the United States. And undoubtedly the Senate had power to delegate authority to its committee to investigate and report what had been and was being done by executive departments under the Leasing Act, the Naval Oil Reserve Act, and the President's order in respect of the reserves, and to make any other inquiry concerning the public domain.

While appellant caused the Mammoth Oil Company to be organized and owned all its shares, the transaction purporting to lease to it the lands within the reserve can not be said to be merely or principally the personal or private affair of appellant. It was a matter of concern to the United States. The title to valuable government lands was involved. The validity of the lease and the means by which it had been obtained under existing law were subjects that properly might be investigated in order

to determine what if any legislation was necessary or desirable in order to recover the leased lands or to safeguard other parts of the public domain.

Neither Senate Joint Resolution 54 nor the action taken under it operated to divest the Senate, or the committee, of power further to investigate the actual administration of the land laws. It may be conceded that Congress is without authority to compel disclosures for the purpose of aiding the prosecution of pending suits; but the authority of that body, directly or through its committees, to require pertinent disclosures in aid of its own constitutional power is not abridged because the information sought to be elicited may also be of use in such suits.

The record does not sustain appellant's contention that the investigation was avowedly not in aid of legislation. He relies on the refusal of the committee to pass the motion directing that the inquiry should not relate to controversies pending in court, and the statement of one of the members that there was nothing else to examine appellant about. But these are not enough to show that the committee intended to depart from the purpose to ascertain whether additional legislation might be advisable. It is plain that investigation of the matters involved in suits brought or to be commenced under Senate Joint Resolution 54 might directly aid in respect of legislative action.

3. There is no merit in appellant's contention that a verdict should have been directed for him because the evidence failed to show that the committee was authorized to make the inquiry, summon witnesses and administer oaths. Resolutions 282 and 294 were sufficient until the expiration of the Sixty-seventh Congress during which they were adopted, but it is argued that Resolution 434 was not effective to extend the power of the committee. As set out in the indictment and shown by the record,

Resolution 434 does not mention 294 or refer to the date of its adoption. The former so far as material follows: "Resolved, That Senate Resolution 282, agreed to April 21, 1922, and Senate Resolution 292, agreed to May 15, 1922, authorizing and directing the Committee on Public Lands and Surveys to investigate the entire subject of leases upon naval oil reserves, with particular reference to the protection of the rights and equities of the Government of the United States and the preservation of its natural resources, and to report its findings and recommendations to the Senate . . . be . . . continued in full force and effect until the end of the Sixty-eighth Congress. The committee . . . is authorized to sit . . . after the expiration of the present Congress until the assembling of the Sixty-eighth Congress and until otherwise ordered by the Senate."

There is enough in that resolution to show that where " 292 " appears 294 was meant. The subject of the investigation is specifically mentioned. That is the only matter dealt with. The sole purpose was to authorize the committee to carry on the inquiry. It would be quite unreasonable, if not indeed absurd, for the Senate to direct investigation by the committee and to allow its power to summon and swear witnesses to lapse. The context and circumstances show that Resolution 294 was intended to be kept in force. See *School District No. 11* v. *Chapman,* 152 Fed. 887, 893–894.

4. Appellant earnestly maintains that the question was not shown to be pertinent to any inquiry the committee was authorized to make. The United States suggests that the presumption of regularity is sufficient without proof. But, without determining whether that presumption is applicable to such a matter, it is enough to say that the stronger presumption of innocence attended the accused at the trial. It was therefore incumbent upon the United States to plead and show that the question

pertained to some matter under investigation. Appellant makes no claim that the evidence was not sufficient to establish the innuendo alleged in respect of the question; the record discloses that the proof on that point was ample.

Congress, in addition to its general legislative power over the public domain, had all the powers of a proprietor and was authorized to deal with it as a private individual may deal with lands owned by him. *United States* v. *Midwest Oil Co.*, 236 U. S. 459, 474. The committee's authority to investigate extended to matters affecting the interest of the United States as owner as well as to those having relation to the legislative function.

Before the hearing at which appellant refused to answer, the committee had discovered and reported facts tending to warrant the passage of Senate Joint Resolution 54 and the institution of suits for the cancellation of the naval oil reserve leases. Undoubtedly it had authority further to investigate concerning the validity of such leases, and to discover whether persons, other than those who had been made defendants in the suit against the Mammoth Oil Company, had or might assert a right or claim in respect of the lands covered by the lease to that company.

The contract and release made and given by Bonfils and Stack related directly to the title to the lands covered by the lease which had been reported by the committee as unauthorized and fraudulent. The United States proposed to recover and hold such lands as a source of supply of oil for the Navy. S. J. Res. 54. It is clear that the question so propounded to appellant was pertinent to the committee's investigation touching the rights and equities of the United States as owner.

Moreover, it was pertinent for the Senate to ascertain the practical effect of recent changes that had been made

in the laws relating to oil and other mineral lands in the public domain. The leases and contracts charged to have been unauthorized and fraudulent were made soon after the executive order of May 31, 1921. The title to the lands in the reserves could not be cleared without ascertaining whether there were outstanding any claims or applications for permits, leases or patents under the Leasing Act or other laws. It was necessary for the Government to take into account the rights, if any there were, of such claimants. The reference in the testimony of Bonfils to the contract referred to in the question propounded was sufficient to put the committee on inquiry concerning outstanding claims possibly adverse and superior to the Mammoth Oil Company's lease. The question propounded was within the authorization of the committee and the legitimate scope of investigation to enable the Senate to determine whether the powers granted to or assumed by the Secretary of the Interior and the Secretary of the Navy should be withdrawn, limited, or allowed to remain unchanged.

5. The question of pertinency under § 102 was rightly decided by the court as one of law. It did not depend upon the probative value of evidence. That question may be likened to those concerning relevancy at the trial of issues in court, and it is not essentially different from the question as to materiality of false testimony charged as perjury in prosecutions for that crime. Upon reasons so well known that their repetition is unnecessary it is uniformly held that relevancy is a question of law. Greenleaf on Evidence (13th ed.) § 49. Wigmore on Evidence, §§ 2549, 2550. And the materiality of what is falsely sworn, when an element in the crime of perjury, is one for the court. *Carroll* v. *United States,* 16 F. (2d) 948, 950. *United States* v. *Singleton,* 54 Fed. 488. *Cothran* v. *State,* 39 Miss. 541, 547.

The reasons for holding relevancy and materiality to be questions of law in cases such as those above referred to apply with equal force to the determination of pertinency arising under § 102. The matter for determination in this case was whether the facts called for by the question were so related to the subjects covered by the Senate's resolutions that such facts reasonably could be said to be "pertinent to the question under inquiry." It would be incongruous and contrary to well-established principles to leave the determination of such a matter to a jury. *Interstate Commerce Commission* v. *Brimson, supra,* 489. *Horning* v. *District of Columbia,* 254 U. S. 135.

6. There is no merit in appellant's contention that he is entitled to a new trial because the court excluded evidence that in refusing to answer he acted in good faith on the advice of competent counsel. The gist of the offense is refusal to answer pertinent questions. No moral turpitude is involved. Intentional violation is sufficient to constitute guilt. There was no misapprehension as to what was called for. The refusal to answer was deliberate. The facts sought were pertinent as a matter of law, and. § 102 made it appellant's duty to answer. He was bound rightly to construe the statute. His mistaken view of the law is no defense. *Armour Packing Co.* v. *United States,* 209 U. S. 56, 85. *Standard Sanitary Mfg. Co.* v. *United States,* 226 U. S. 20, 49.

7. The conviction on the first count must be affirmed. There were ten counts, demurrer was sustained as to four, *nolle prosequi* was entered in respect of two, and conviction was had on the first, fourth, fifth and ninth counts. As the sentence does not exceed the maximum authorized as punishment for the offense charged in the first count, we need not consider any other count. *Abrams* v. *United States,* 250 U. S. 616, 619.

*Judgment affirmed.*