**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Edward YELLIN, Defendant-Appellant.**

**No. 13097.**

United States Court of Appeals
Seventh Circuit.

Feb. 16, 1961.

Rehearing Denied April 3, 1961.

Victor Rabinowitz, New York City, Burton D. Wechsler, Gary, Ind., for appellant.

J. Walter Yeagley, Asst. Atty. Gen., Internal Security Division, U. S. Dept. of Justice, Washington, D. C., Kenneth C. Raub, U. S. Atty., Hammond, Ind., Kevin T. Maroney, Lee B. Anderson, Attys., Dept. of Justice, Washington, D. C., for appellee.

Before SCHNACKENBERG, KNOCH and CASTLE, Circuit Judges.

KNOCH, Circuit Judge.

Defendant was indicted in five counts for the offense of contempt of Congress, in violation of Title 2 U.S.C.A. § 192,[1] in willfully refusing to answer questions pertinent to the subject then under inquiry[2] by the House of Representatives'

1. "Every person who having been summoned as a witness by the authority of either House of Congress to give testimony or to produce papers upon any matter under inquiry before either House, or any joint committee established by a joint or concurrent resolution of the two Houses of Congress, or any committee of either House of Congress, willfully makes default, or who, having appeared, refuses to answer any question pertinent to the question under inquiry, shall be deemed guilty of a misdemeanor, punishable by a fine of not more than $1,000 nor less than $100 and imprisonment in a common jail for not less than one month nor more than twelve months."

2. As stated in the indictment, the subject under inquiry was: " * * · *  to-wit: The extent, character, and objects of Communist infiltration and Communist Party propaganda activities in basic industry in the Gary, Indiana, area, and the execution by administrative agencies concerned of Public Law 637, of the 83rd Congress known as the Communist Control Act of 1954, relating to the eligibility to exercise the rights and privileges provided under the National Labor Relations Act of labor organizations determined by the Subversive Activities Control Board to be Communist-infiltrated organizations."

Committee on Un-American activities. Each count alleged refusal to answer a single question. The fifth count was dismissed on motion of the government. Counts I to IV, inclusive, listed the following questions:

"I. Mr. Yellin, where did you reside prior to September 1957?

"II. Will you tell the committee, please, whether or not incidents came to your attention of the colonization of the steel unions in Gary by the Communist Party at any time prior to September 1957?

"III. Were you a member of the Communist Party on the 23d of June, 1949, which is the date of application filed in your name for employment in Gary?

"IV. Will you tell the committee whether or not in 1957 there were present in any of the steel unions at Gary, Indiana, persons who were known to you to have been colonizers of the Communist Party?"

Defendant waived jury trial. The District Court found him guilty as charged in Counts I to IV, inclusive, and imposed concurrent sentences of one year on each count, plus a fine of $250. Defendant took this appeal.

Defendant argues that he was subpoenaed to testify in February, 1958, a few months after the United States Supreme Court had decided Watkins v. United States, 354 U.S. 178, 77 S.Ct. 1173, 1 L.Ed.2d 1273 (June 1957), and that, relying on Watkins, he believed that he was not required to answer the questions put to him. Therefore, he contends that he cannot be said to have had the requisite criminal intent to support conviction. He further contends that:

"Rule XI of the House Rules, which defines the jurisdiction of the House Committee on Un-American activities, is so unclear on its face that it cannot support a criminal charge."

The pertinent portions of the Rule read:

"17. Committee on Un-American Activities. * * *

"(b) The Committee on Un-American Activities, as a whole or by subcommittee, is authorized to make from time to time investigations of (1) the extent, character, and objects of un-American propaganda activities in the United States, (2) the diffusion within the United States of subversive and un-American propaganda that is instigated from foreign countries or of a domestic origin and attacks the principle of the form of government as guaranteed by our Constitution, and (3) all other questions in relation thereto that would aid Congress in any necessary remedial legislation.

"The Committee on Un-American Activities shall report to the House (or to the Clerk of the House if the House is not in session) the results of any such investigation, together with such recommendations as it deems advisable.

"For the purpose of any such investigation, the Committee on Un-American Activities, or any subcommittee thereof, is authorized to sit and act at such times and places within the United States, whether or not the House is sitting, has recessed, or has adjourned, to hold such hearings, to require the attendance of such witnesses and the production of such books, papers, and documents, and to take such testimony, as it deems necessary. Subpenas may be issued under the signature of the chairman of the committee or any subcommittee, or by any member designated by any such chairman, and may be served by any person designated by any such chairman or member. * * *

"26. To assist the House in appraising the administration of the laws and in developing such amendments or related legislation as it may deem necessary, each standing committee of the House shall exercise continuous watchfulness of the execution by the administrative agencies concerned of any laws, the sub-

ject matter of which is within the jurisdiction of such committee; and, for that purpose, shall study all pertinent reports and data submitted to the House by the agencies in the executive branch of the Government."

On January 15, 1958, the Committee had adopted a resolution to hold hearings in Gary, Indiana. Under authority of an earlier resolution, January 22, 1957, Chairman Francis E. Walter designated a three-man subcommittee, with himself as its Chairman, to conduct hearings in Gary on February 10 and 11, 1958.

Defendant makes a point of the fact that the U. S. Supreme Court did not decide Barenblatt v. United States, 1959, 360 U.S. 109, 79 S.Ct. 1081, 3 L.Ed.2d 1115 until after his refusal to answer the subcommittee's questions. In Barenblatt, the Supreme Court had held that the House Committee on Un-American Activities and its subcommittees were authorized by compulsory process to investigate Communist activities in this country, and that the record there, (as in the case before us) refuted the contention that the defendant was not adequately apprised of the pertinency of the subcommittee's questions to the subject matter of the inquiry. We do not agree with defendant that Barenblatt modified the earlier holding in Watkins. The facts differed. In distinguishing Watkins, the Supreme Court states in Barenblatt, 360 U.S. at page 123, 79 S.Ct. at page 1091:

"[A]nd the questions asked the petitioner were not only amorphous on their face, but in some instances clearly foreign to the alleged subject matter of the investigation—* * "

Defendant quotes from Barenblatt, 360 U.S. at page 126, 79 S.Ct. at page 1093, that:

"Where First Amendment rights are asserted to bar governmental interrogation resolution of the issue always involves a balancing by the courts of the competing private and public interests at stake in the particular circumstances shown."

Defendant argues that he was, therefore, entitled to introduce testimony relating to such balance of interests in the circumstances shown here. Defendant called Professor Thomas I. Emerson, Professor of Law at Yale University, to testify as an expert on the issue of balancing the public and private interests in this case. The District Court sustained the government's objection that this constituted opinion evidence on matters of law and invaded the province of the Court. Aside from the rejected testimony, defendant argues that there was little value to the testimony sought to be elicited from him; that it was solely cumulative in nature, the subcommittee having taken much evidence on this subject in other areas; and that it was insufficient to outbalance the defendant's substantial rights under the First Amendment to the Constitution.

Rule IV-A (1) of the Committee's Rules of Procedure provides:

"If a majority of the Committee or Subcommittee, duly appointed as provided by the rules of the House of Representatives, believes that the interrogation of a witness in a public hearing might endanger national security or unjustly injure his reputation, or the reputation of other individuals, the Committee shall interrogate such witness in an Executive Session for the purpose of determining the necessity or advisability of conducting such interrogation thereafter in a public hearing."

Defendant's counsel, under date of February 6, 1958, had sent a telegram to Frank Tavenner, the Committee's counsel, at Washington, D. C., requesting:

"[E]xecutive session in lieu of open session, testimony needed for legislative purposes * * * can be secured in executive session without exposing witnesses to publicity."

Mr. Tavenner testified in the District Court that he was no longer in Washington when the telegram arrived, having already left for Gary. The Staff Direc-

tor, Richard Arens, on February 6, 1958, sent defendant's counsel an answering telegram advising him that his request was denied. The Chairman, Congressman Walter, at the hearing on February 10, 1958, refused to allow defendant's counsel to read the two telegrams into the record, although he did state that their inclusion in the record would be considered in executive session. Both telegrams are a part of the record before us. Defendant characterizes these actions of the Committee as a failure to adhere to its own rules, which excused defendant's refusal to answer questions in public session.

Defendant further contends that the questions set out in Counts II and IV are too vague to support an indictment and that the Committee has in fact no genuine legislative purpose.

Defendant sees the contested issues as:

"1. Was appellant guilty of a willful violation of 2 U.S.C.[A.] 192?

"2. Did the District Court err in refusing to admit the profferred [sic] testimony of Professor Thomas I. Emerson?

"3. On this record, does the public interest in securing answers to the questions put to appellant outweigh his interest in protecting his rights under the First Amendment?

"4. Did the Committee violate its own rules in refusing to grant or to consider appellant's request for an executive session?

"5. Were the questions contained in Counts 2 and 4 too vague to support a criminal indictment?

"6. Does the House Committee on Un-American Activities have a genuine legislative purpose?"

■ The record shows that at the opening of the proceedings in Gary, on February 10, 1958, the Chairman, Congressman Walter, stated the purpose of the hearing, as set out in the resolution of January 15, 1958, to inquire into:

"1. The extent, character and objects of Communist infiltration and Communist Party propaganda activities in basic industry in the Gary, Indiana area, the legislative purpose being to obtain additional information for use by the Committee in its consideration of Section 16 of H.R. 9352, relating to the proposed amendment of Section 4 of the Communist Control Act of 1954 [50 U.S. C.A. § 843], prescribing a penalty for knowingly and willfully becoming or remaining a member of the Communist Party with knowledge of the purpose or objective thereof, and for the additional legislative purpose of adding to the Committee's overall knowledge on the subject, so that Congress may be kept informed and thus prepared to enact remedial legislation in the national defense and for internal security, when and if the exigencies of the situation require it.

"2. Execution by administrative agencies concerned of Public Law 637 of the 83d Congress known as the 'Communist Control Act of 1954', relating to the eligibility to exercise the rights and privileges provided under the National Labor Relations Act of labor organizations determined by the Subversive Activities Control Board to be Communist-infiltrated organizations. The legislative purpose is to assist Congress in appraising the administration of the Communist Control Act of 1954, and to enact such amendments thereto as the exigencies of the situation require."

The Chairman then explained, in detail, about the Omnibus Security Bill, H.R. 9352, a comprehensive effort to deal with all problems in the field of internal security, and the hope of the Committee that factual information obtained at this hearing would be of assistance in consideration of the numerous provisions of that Bill. He explained further that information was particularly sought for

use in connection with the proposed amendment of Section 4 of the Communist Control Act of 1954, prescribing a penalty for knowingly and willingly becoming or remaining a member of the Communist Party with knowledge of its purpose or objective: thus clearly setting out a genuine legislative purpose. Defendant at the hearing February 10, 1958, testified that he had heard this statement by the Chairman, and that he heard the testimony of John Lautner, the witness who preceded the defendant at the February 10th hearing. Mr. Lautner had testified that he was a high functionary in the Communist Party from 1930 to 1950. He described a policy of colonization in basic industries to penetrate trade unions, whereby colonizers, who were frequently undergraduate college students, would misrepresent their identity, background and education, in order to operate in various different areas under differing aliases.

When defendant refused to answer the question: "Where did you reside prior to September 1957?" stating his reliance on Watkins, Mr. Tavenner explained further that it would be impossible for the Committee to learn anything from defendant regarding Communist Party activities in the Gary area, without first ascertaining whether defendant had been in the area for a period of time. Having explained the basis for the question, Mr. Tavenner then asked the Chairman to direct defendant to answer. Defendant again refused to answer.

Evidence was introduced regarding defendant's college education and an application for employment made in defendant's name, which not only failed to set out the college education (in possible conformity to the policy outlined by Mr. Lautner) but which stated that the defendant had been employed at certain automobile establishments during the very periods that other records showed him to have been attending the University of Michigan. Defendant refused to answer any questions pertaining to his application for employment, his educa-

tion, or his background. Mr. Tavenner explained, again in vain, about the practice of the Communist Party in colonizing industry, and the Committee's need to understand the full tactics of operations in Gary, which constituted the reason for the questions.

In his testimony at the trial, Mr. Tavenner testified that it was the practice of the Committee to interview witnesses prior to subpoena to determine whether they had information of value. He testified further that the Committee already had evidence which led them to believe that the defendant had been a member of the Communist Party at the University of Michigan, that he had been transferred there from New York City, and then to Gary to secure employment in the steel plants, and that he had been engaged in Communist Party activity while so employed. On the basis of this information, the Committee was already satisfied, without prior interview, that defendant could, if willing, supply the Committee a great deal of data regarding infiltration of the steel industry and plans for colonization there in the Gary area.

Defendant's reliance on Watkins is misplaced. Watkins' testimony was characterized in the government's brief in that case as:

"A more complete and candid statement of his past political associations and activities (treating the Communist Party for present purposes as a mere political party) can hardly be imagined."

He agreed to answer any questions about himself, but he believed questions about other persons who had removed themselves from the Communist movement to be irrelevant to the work of the Committee. The Supreme Court in Watkins said, 354 U.S. at page 209, 77 S.Ct. at page 1190:

"There are several sources that can outline the 'question under inquiry' in such a way that the rules against vagueness are satisfied. The

authorizing resolution, the remarks of the chairman or members of the committee, or even the nature of the proceedings themselves, might sometimes make the topic clear."

Unlike those in the Watkins case, the proceedings here clearly indicated through detailed, explanatory statements and prior testimony, the precise nature of the inquiry and the pertinency of the questions which defendant was asked.

■ Defendant's mistaken reliance on Watkins as a basis for refusal to testify does not rob that refusal of willfulness. His refusal was deliberate. The fact that he thought he had a right to refuse made his deliberate refusal no less willful. In Sinclair v. United States, 1929, 279 U.S. 263, 299, 49 S.Ct. 268, 73 L. Ed. 692, the fact that the accused acted in good faith on advice of competent counsel in refusing to answer a question was held not to be a defense.

The proffered expert testimony of Professor Emerson on the issue of the balance between public and private interests in this case is a part of the record before us. We have carefully read Professor Emerson's statement of the elements to be considered and the weight he assigned to each. He concluded that the interest of the government in obtaining answers from the defendant was outweighed by the defendant's interest in freedom of speech or silence and by the community's interest in maintaining freedom of political expression.

■ We are compelled to agree with the District Judge who stated:

"[I]t seems to me that expert testimony of this kind is not material in that it is not a question of fact as to what elements go to make up the balance of interests, public and private, but a legal matter, which is within the province of the Court to decide; and it is not a subject of expert testimony."

■ In oral argument, defendant's counsel conceded that the questions put to defendant had a logical relationship to the subject under inquiry and were pertinent in that sense. He argued, however, that as mere cumulative evidence, the testimony sought from defendant had only miniscule pertinence, when balanced against defendant's private right of silence. We cannot agree. On the record before us, there was substantial basis for the District Court's conclusion that the balance here was in favor of the public interest.

■ Apart from the fact that the defendant has nowhere shown a danger to national security, or unjust injury to his reputation or that of others, in a public interrogation, our reading of Rule IV-A leads us to conclude that it confers no rights on the witness. If a majority of the Committee or subcommittee believe public interrogation of a witness might endanger national security or unjustly injure his reputation, or the reputation of others, then such witness shall be interrogated in executive session to determine the advisability of subsequent public interrogation. No provision is made for the witness to compel the Committee to poll its members on this question with respect to any specific witness.

With respect to Counts II and IV, defendant contends that the issue is not whether he understood the meaning of the questions, but whether the terminology is so vague that it fails to meet the requirements of the Sixth Amendment or of Rule 7(c) of the Federal Rules of Criminal Procedure, 18 U.S.C.A.

■■ As the sentences imposed here are to run concurrently, it is sufficient to support the judgment of the Court below if conviction on any count is affirmed. However, we have studied these two counts and conclude that they do meet the test.

All other arguments put forth by the defendant have been considered with care and found to be lacking in merit.

The judgment of the District Court is affirmed.