19 F.3d 1435
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
George SANTOSUOSSO, Defendant-Appellant.
 No. 91-3943.
 United States Court of Appeals, Sixth Circuit.
 Feb. 25, 1994.
 
 Before: MILBURN and BOGGS, Circuit Judges; and MILES, Senior District Judge.*
 PER CURIAM.
 
 
 1
 Defendant-appellant George Santosuosso appeals his jury conviction and sentence for perjury, in violation of 18 U.S.C. Sec. 1623. We affirm.
 
 
 2
 * A joint investigation conducted by the FBI and IRS into sports gambling activities in the Cleveland, Ohio, area implicated Santosuosso. In September 1987, search warrants were executed on the bookmaking operation of Emmett "Lucky" Taylor. Bookmaking records were seized from the operation's main office, from Taylor's home, and from the homes of Taylor's associates, Wally Overko and Larry Dedor. Tape recordings were seized from the homes of Taylor and Overko; additional tape recordings were obtained from the Cleveland police department, which had seized tapes from Overko's bookmaking office in 1985. Additional warrants were executed in December 1987, leading to the seizure of more records.
 
 
 3
 Dedor testified at trial that Santosuosso wagered $500 to $1500 per game. FBI Special Agent John Sommer testified that Santosuosso admitted, on February 11, 1988, to betting on up to twenty games a week, often carrying a $2500 to $4000 balance, having "45" as a code number, and having wagered with Taylor for four years. Sommer testified that Santosuosso admitted that he acted as a go-between for Taylor and a bettor, Ted Busch, the former mayor of Westlake, Ohio. Dedor testified that, in return for Santosuosso's services, Taylor shared the profits from Busch's betting with Santosuosso. Busch testified that Santosuosso tried to collect the overdue gambling debts that Busch owed to Taylor.
 
 
 4
 Santosuosso appeared with counsel (John Henck) before the grand jury on February 2, 1988. Santosuosso testified that he knew Taylor was a bookmaker, had known him for two years, and had first placed a bet with him about a year before, but did not have a code number (these statements constitute the basis of count 1 of the indictment). Santosuosso further testified that he had never accepted bets for Taylor, had never acted as a go-between for bets that ultimately would be placed with Taylor, and doubted that his (Santosuosso's) brother Michael was a bookmaker, even though he did have a "gambling problem" (count 2). Santosuosso also testified that he made only "minimal bets" of $50 with Taylor and that it was "[h]ard to say" if he had bet more than one game at a time (count 3). Finally, Santosuosso testified that he had heard of Busch, but did not know him personally and did not think he had spoken on the phone with him (count 4). The indictment also charged Santosuosso with participation in an illegal gambling business (count 5).
 
 
 5
 Shortly thereafter, Special United States Attorney Michael Rae of the Organized Crime Strike Force arranged a meeting with Santosuosso to supplement or correct his grand jury testimony, based upon information he had received and his belief that Santosuosso had committed perjury. The meeting was held February 4, 1988, at Henck's office; Santosuosso, Henck, Rae, Sommer, and IRS Special Agent Ed Licht were present. With one minor exception, Santosuosso declined to alter his grand jury testimony. In order to "test" Santosuosso's veracity, Rae casually asked Santosuosso at the coffee machine if he would produce voice exemplars for purposes of comparison with other tapes the government had; Rae repeated his request to Henck. Rae claims he never told Santosuosso or Henck that the government had tapes with Santosuosso's voice; Santosuosso insists that Rae falsely stated that he did have such tapes.
 
 
 6
 The next day, Agent Licht informed Rae that Taylor's records indicated that Santosuosso had a code number (# 45) and had a $5225 balance in Taylor's books. Rae informed Henck of this newly discovered evidence, informed him that Santosuosso would be charged with perjury, and agreed to meet on February 11 to discuss the matter. At that meeting, Santosuosso was shown the records. Santosuosso agreed to a plea proposed by Rae: if Santosuosso would be totally cooperative and truthful, he would be charged with only one count of perjury and the Government would inform the sentencing court of his cooperation. Santosuosso then provided a statement in which he acknowledged that he was code number 45, that he was a large bettor ($500 per game, several games per week), that for a profit he helped Taylor take bets from Busch, and that he had called Busch ten to twenty times, left messages for him, and spoken with him at least once in an attempt to collect an overdue gambling debt for Taylor. Santosuosso agreed to provide this information under oath to the grand jury.
 
 
 7
 At a meeting on February 25, 1988, arranged to prepare Santosuosso for his reappearance before the grand jury, Santosuosso breached the plea agreement by refusing to answer questions about other bookmakers. Santosuosso, after consulting with his lawyer, told the Government that matters were terminated. On October 9, 1990, Santosuosso was indicated on four counts of perjury and one count of participation in Taylor's gambling business.
 
 
 8
 On December 10, 1990, Santosuosso again engaged in plea negotiations. The government now knew that the tapes it had with a conversation with "George" and with "# 45" did not contain Santosuosso's voice; Santosuosso's lawyer listened to the tapes and agreed. Santosuosso agreed to be interviewed before entering a plea agreement, but provided essentially the same information regarding Taylor as he provided on February 11, 1988. A plea agreement was made, and on December 11, Santosuosso pleaded guilty to participating in the illegal gambling business. After obtaining new counsel, however, Santosuosso was permitted by the court to withdraw his guilty plea. Santosuosso then moved to suppress the February 1988 statements on the ground that they were obtained during the course of plea negotiations and thus were not admissible into evidence under Fed.R.Crim.P. 11(e)(6).
 
 
 9
 On March 27, 1991, the court held a hearing on the motion to suppress the statements. Santosuosso argued that they should be suppressed because they were made in reliance on Rae's false statement, in violation of professional ethics, that he had Santosuosso on tape. Rae testified at the hearing that he never said that Santosuosso was on tape; Sommer testified that tapes of Santosuosso were never mentioned; Henck testified that he had been "uncertain" as to whether Santosuosso was on tape and did not recall anyone expressly stating that he was; and Santosuosso testified that he provided information because he thought the Government had him on tape and that the information he provided was false, even though he was supposed to present that same information under oath to the grand jury. Santosuosso also acknowledged that he entered the same plea agreement in December 1990 even though he and his lawyers were fully apprised that he was not on tape. The district judge denied the motion to suppress the statements, finding that Rae had made no false statements to Santosuosso and therefore did not intentionally mislead him or violate ethical standards, and that Santosuosso's statements had been made voluntarily.
 
 
 10
 At trial, Santosuosso contended that Rae and the federal agents had coerced him into making the February 11 statements by threatening to take all his belongings, take him away from his family, and imprison him for a long time under RICO. Sommer testified that RICO had never been mentioned in the February 1988 meetings. Santosuosso at trial admitted that he entered the February 11 plea agreement and that he breached it on February 25.
 
 
 11
 The Government also introduced at trial the testimony of Steven Bucha, another bookmaker apparently unaffiliated with Taylor. Bucha testified that Santosuosso had placed bets with him in the past at Bucha's $300 limit.
 
 
 12
 After charging the jury, the district court did not discharge the two alternate jurors but, instead, permitted them to retire with the jury and observe the jury's deliberations. The judge's reason for doing so apparently was that if a juror had to leave, one of the alternates could be substituted. The district judge first instructed the alternates not to participate, but the transcript indicates that only one of the two alternates verbally expressed understanding the judge's instruction. Santosuosso raised no objection at the time.
 
 
 13
 The jury found Santosuosso guilty of counts 2 and 3, but acquitted him on counts 1 and 4. The district court had granted Santosuosso's motion for judgment of acquittal on the gambling count. The district court sentenced Santosuosso to 21 months' incarceration and three years' supervised release, and fined him $40,000[1] and the $100 special assessment. Santosuosso appeals to this court. He argues that the district court erred in denying his motion to suppress, in admitting Bucha's testimony, in permitting the alternate jurors to retire with the jury when it deliberated, in ruling as a matter of law on the materiality of the perjurious statement, and in calculating his offense level under the sentencing guidelines. We address each contention in turn.
 
 II
 
 14
 * Santosuosso argues that Rae violated Rule 7-102(A)(5) of the American Bar Association Code of Professional Responsibility, which prohibits a lawyer from knowingly making a false statement of law or fact, and that therefore his statements should be suppressed. He argues that Rae's admission that he wanted to "test" him is evidence that the district court's finding was clearly erroneous. Further, Santosuosso points to the transcript from the hearing on his motion for an appeal bond, in which the district judge indicates that he "allow[ed] anger over a plea that was made [but withdrawn] to influence a decision," that he had inadvertently overlooked the conversation between Rae and Santosuosso at the coffee machine, that he was "disturb[ed]" by the government's tactics to get evidence against Taylor, that he was "concerned about the tapes, the hearing to suppress ... the statement made, [which] might have had an effect on the verdict," and that he had "great concern over the conduct of [Rae]." J.A. at 422-24, 438. Santosuosso also seeks reversal on the ground that the statements were obtained during the course of plea discussions and thus were inadmissible under Fed.R.Crim.P. 11(e)(6)(D) and Fed.R.Evid. 410.
 
 
 15
 We accept the findings of fact upon which the district court relied in dealing with suppression of evidence unless those findings are clearly erroneous, United States v. French, 974 F.2d 687, 691 (6th Cir.1992), cert. denied, 113 S.Ct. 1012 (1993), and uphold the district court's evidentiary rulings absent a clear showing of abuse of discretion, United States v. Taplin, 954 F.2d 1256, 1258 (6th Cir.1992). We accord considerable deference to the credibility findings of the district court. United States v. Cooke, 915 F.2d 250, 252 (6th Cir.1990).
 
 
 16
 The district court, following the suppression hearing, found that Rae did not falsely state that he had Santosuosso on tape and did not intentionally mislead Santosuosso; the district court based its conclusions on the testimony of Rae (who said he did not tell Santosuosso or Henck that he had Santosuosso on tape), Sommer (who testified that he did not hear Rae or anyone say that the government had Santosuosso on tape), and Henck (who could not recall being told that the government in fact had Santosuosso on tape). Thus, the district court rejected the testimony of Santosuosso. The district court further found that the statements had been made voluntarily. Given the importance of credibility determinations here, a review of the transcript of the suppression hearing supports the conclusion that these findings are not clearly erroneous.
 
 
 17
 The record also indicates that the plea agreement had already been made prior to Santosuosso's statements and therefore the statements were made after, not during the course of, plea negotiations. At the suppression hearing, Santosuosso stated that the agreement was that he would be charged with only one count of perjury in exchange for "100 percent cooperation" in providing information. J.A. at 101. He stated that he made admissions "because I had to be 100 percent truthful with [the investigators]." J.A. at 105. He testified that he acknowledged at the February 11 meeting that he was code number 45 with Taylor "because it was evidence that you [the prosecutor] said you had, and I had to give you the 100 percent truth." J.A. at 109. These statements suggest that the agreement had been made and that Santosuosso was complying with its terms. He further testified that he had "agreed to plead guilty to one count of perjury," J.A. at 111, and that "[a]fter supposedly accepting one count of perjury, they asked me questions about conversations with Mr. Busch." J.A. at 108. From Santosuosso's testimony alone, then, it is clear that the plea had been agreed to, and Santosuosso was providing the information in accordance with the terms of the agreement--i.e., after the negotiations were over.
 
 
 18
 Henck's testimony does not indicate clearly one way or the other whether the statements made by Santosuosso were in the course of plea negotiations or after an agreement had been made. Rae's testimony indicates that the statements were made after Santosuosso had agreed to plead guilty. J.A. at 172, 174. Thus, there is sufficient evidence in the record for the district court to have found that the plea had been agreed to before the statements were made.
 
 
 19
 Santosuosso places great weight on certain statements made by the district judge at the appeal bond hearing. We note that such ruminations are of no legal effect. While the district judge did express some concern over the circumstances under which Santosuosso's February 11, 1988, statements were made, he apparently determined that the circumstances were not so egregious as to warrant reversing his earlier findings that Santosuosso's statements had been made voluntarily and that Rae had not intentionally misled him. The district judge did not grant Santosuosso's motion for judgment of acquittal, which he had the power to do. A court speaks by its judgments, and any other discussion, however intended, does not overpower or undermine the court's own rulings.
 
 
 20
 The district court's denial of Santosuosso's motion to suppress is affirmed. We note that counsel for the Government indicated at oral argument that, in the Northern District of Ohio, the United States Attorney now reduces all plea agreements to writing. We recommend that all prosecutors take similar steps in making plea agreements in order to avoid raising any doubts as to whether agreements have been made.
 
 B
 
 21
 Santosuosso argues that Bucha's testimony that Santosuosso placed large and frequent bets with him should have been ruled inadmissible under Fed.R.Evid. 404(b), which prohibits admission of "[e]vidence of other crimes, wrongs, or acts ... to prove the character of a person in order to show action in conformity therewith." Santosuosso also argues that there was no connection shown between Bucha and Taylor.
 
 
 22
 Santosuosso admitted placing bets with, among others, Bucha. Thus, Bucha's testimony was relevant insofar as it helped establish or corroborate the amounts of the bets placed by Santosuosso, which is directly at issue in count 3 of the indictment. Bucha's testimony also corroborated the testimony of others who testified to the amounts of the bets placed by Santosuosso. Further, in cross-examining Bucha, defense counsel, in an effort to discredit Bucha's testimony by impeaching his memory, questioned Bucha as to the amount of the bets placed by Santosuosso, suggesting that defense counsel recognized the relevance of Bucha's testimony. Finally, Sommer's testimony suggests a connection between Bucha's operation and Taylor's. Because Bucha's testimony was thus relevant to the charges against Santosuosso, we hold that the district court did not abuse its discretion in admitting Bucha's testimony.
 
 C
 
 23
 Santosuosso next argues that the district court erred in permitting the alternate jurors to retire with the jury when it deliberated, citing Fed.R.Crim.P. 24(c), which requires that "[a]n alternate juror who does not replace a regular juror shall be discharged after the jury retires to consider its verdict." Santosuosso relies solely on United States v. Olano, 113 S.Ct. 1770 (1993).
 
 
 24
 Olano addressed the question of whether the presence of alternate jurors during jury deliberations is a "plain error" requiring correction by the court of appeals. The trial court in Olano had allowed the two alternate jurors to sit with the jury during deliberations, but instructed them not to participate; defense counsel made no objection at the time. The Supreme Court concluded that the "presence of alternate jurors during jury deliberations is not the kind of error that 'affect[s] substantial rights' independent of its prejudicial impact." 113 S.Ct. at 1779 (quoting Fed.R.Crim.P. 52(b)). A defendant must make a specific showing of prejudice for the alternate jurors' presence to be plain error. The "ultimate inquiry" is whether the jury's deliberations, and thereby its verdict, were affected. Id. at 1780.
 
 
 25
 Here, like the defendants in Olano, Santosuosso has made no specific showing that the alternate jurors either participated in the jury's deliberations or "chilled" the regular jurors' deliberations. The Court in Olano rejected the same arguments pressed by Santosuosso here. The Court specifically rejected the appellate court's finding that the error was inherently prejudicial. The Court noted that the alternate jurors were "indistinguishable" from the regular jurors (having taken an oath, received the normal initial admonishment, heard the same evidence and arguments, and not having been identified as alternates until after the final set of instructions). Further, jurors are presumed to follow the court's instructions. Finally, the Court stated that the mere presence of alternate jurors did not entail a sufficient risk of chill to justify a presumption of prejudice. Id. at 1781.
 
 
 26
 Santosuosso's case differs slightly in that the alternate jurors were identified from the outset. Santosuosso argues that they therefore heard the evidence with less attention than the regular jurors and were like mere strangers sitting in on the deliberations. We are not persuaded. Santosuosso cites no authority that would indicate that alternate jurors so identified would fail to follow the district court's instructions or would disregard their oaths. Further, Fed.R.Crim.P. 24(c) specifically allows alternate jurors, who are routinely identified as being alternates, to "replace jurors who, prior to the time the jury retires to consider its verdict, become or are found to be unable or disqualified to perform their duties." Thus, Fed.R.Crim.P. 24(c) contemplates that alternate jurors will hear the evidence and arguments with the same attention as regular jurors. Without a specific showing of prejudice, the same result as in Olano obtains here.
 
 D
 
 27
 Santosuosso argues that the district court erred in ruling as a matter of law on the materiality of the perjurious statements, violating the due process requirement that a jury find each element of a crime beyond a reasonable doubt in order to convict. Materiality of the allegedly perjurious statements is an essential element of the offense of perjury. United States v. Adams, 870 F.2d 1140, 1146-47 (6th Cir.1989). After instructing the jury on the elements of perjury,[2] the district judge told the jury: "The materiality of the testimony alleged to be false is not a matter with which you are to be concerned, but is rather a question for the Court to decide. You are instructed as a matter of law the declarations alleged in the indictment as false concerned matters material to the investigation of the grand jury." J.A. at 399-400.
 
 
 28
 This court has held that the question of materiality in a perjury case is one of law for the court to decide. United States v. Seltzer, 794 F.2d 1114, 1123 (6th Cir.1986), cert. denied, 479 U.S. 1054, 107 S.Ct. 927 (1987); United States v. Giacalone, 587 F.2d 5, 6 (6th cir.1978), cert. denied, 442 U.S. 940, 99 S.Ct. 2882 (1979). See also Sinclair v. United States, 279 U.S. 263, 298-99, 49 S.Ct. 268, 273-74 (1929) (materiality of allegedly perjurious statement is a question of law for the court).
 
 
 29
 Santosuosso relies primarily on United States v. Taylor, 693 F.Supp. 828 (N.D.Cal.1988), which, after examining the sources of the rule that materiality is for the court, concluded that there is no analytical support for that rule. Because one panel of this court cannot overrule the decision of another panel, absent an intervening Supreme Court decision, Meeks v. Illinois Central Gulf R.R., 738 F.2d 748, 751 (6th Cir.1984), we are bound by the decisions in Seltzer, Giacalone, and the other Sixth Circuit cases upholding the materiality rule at issue here.[3] We note, too, that while "the materiality of a statement rests upon a factual evidentiary showing, the ultimate finding of materiality"--i.e., whether a statement is of legal consequence--"turns on an interpretation of substantive law," which is a matter of law for the courts to decide. United States v. Abadi, 706 F.2d 178, 180 (6th Cir.), cert. denied, 464 U.S. 821, 104 S.Ct. 86 (1983) (quoted with approval in Kungys v. United States, 485 U.S. 759, 772, 108 S.Ct. 1537, 1547 (1988)). Thus, there is analytical support for the rule.
 
 
 30
 Because Santosuosso does not challenge the district court's ruling on the merits of whether the statements were material, we hold that the district court did not err in instructing the jury on the element of materiality.
 
 E
 
 31
 Finally, Santosuosso argues that the two counts of perjury should have been grouped together for sentencing purposes pursuant to U.S.S.G. Sec. 3D1.2. Santosuosso correctly points out that the presentence report erroneously stated that Sec. 3D1.2(d) specifically excludes these perjury charges from grouping. Had the counts been grouped, Santosuosso contends, he would have had a lower total offense level (twelve, rather than fourteen) and thus been eligible for a lower sentencing range (ten-to-sixteen months, rather than fifteen-to-twenty-one months).
 
 
 32
 Guideline interpretation is a question of law subject to de novo review. United States v. Beckner, 983 F.2d 1380, 1383 (6th Cir.1993). Here, the base offense level for perjury is twelve. U.S.S.G. Sec. 2J1.3(a). Santosuosso was convicted of two counts of perjury for false testimony given during a single grand jury proceeding. The district court should group multiple counts into one group if they are closely related counts, pursuant to the rules in Sec. 3D1.2. U.S.S.G. Sec. 3D1.1(a)(1). After the counts are appropriately grouped, the offense level is then calculated pursuant to Sec. 3D1.3. U.S.S.G. Sec. 3D1.1(a)(2).
 
 
 33
 The transcript of the sentencing hearing indicates that the district judge grouped both counts into one single group for a base level of twelve (U.S.S.G. Sec. 2J1.3(a)) and added a two-level enhancement for obstruction of justice (U.S.S.G. Sec. 3C1.1), for a total offense level of fourteen. J.A. at 416. The district judge did not group the two counts into two groups of distinct offenses, which would have yielded a total offense level of sixteen (base offense level of twelve for one group pursuant to Sec. 2J1.3, plus two-level enhancement under Sec. 3D1.3 for two groups of offenses, plus two-level enhancement under Sec. 3C1.1 for obstruction of justice). Thus, while the presentence report's conclusion regarding Sec. 3D1.2(d) was incorrect, the district judge properly applied the guidelines. Santosuosso does not challenge in his appeal to this court the two-level enhancement for obstruction of justice, so we shall not disturb the district court's calculation.
 
 III
 
 34
 For the foregoing reasons, Santosuosso's convictions and sentence are AFFIRMED.
 
 
 
 *
 The Honorable Wendell A. Miles, Senior United States District Judge for the Western District of Michigan, sitting by designation
 
 
 [1]
 The transcript of the sentencing hearing indicates that the district judge imposed a fine of $10,000, J.A. at 419, but the judgment indicates a $40,000 fine, J.A. at 41. The parties do not challenge or discuss this apparent discrepancy
 
 
 [2]
 The essential elements of 18 U.S.C. Sec. 1623 are that the defendant testified under oath before a grand jury, that he made materially false declarations, and that he acted knowingly
 
 
 [3]
 Nor does Taylor appear to be an accurate statement of the law in the Ninth Circuit. See United States v. Martinez, 855 F.2d 621, 623-24 (9th Cir.1988) (materiality is question of law for court under 18 U.S.C. Sec. 1623); United States v. Clark, 918 F.2d 843, 845-46 (9th Cir.1990) (materiality is question of law for court under 18 U.S.C. Sec. 1621 (general perjury statute))