In re Grand Jury SUBPOENA Duces Te-
cum Issued TO Richard M. NIXON, or
any Subordinate Officer, Official, or
Employee with Custody or Control of
Certain Documents or Objects.

Misc. No. 47–73.

United States District Court,
District of Columbia.

Aug. 29, 1973.

Archibald Cox, Watergate Special Prosecutor Force, Philip A. Lacovara, Peter M. Kreindler, Washington, D. C., James F. Neal, Nashville, Tenn., for movant.

Leonard Garment, New York City, J. Fred Buzhardt, McCormick, S. C., Charles Alan Wright, Austin, Tex., Douglas M. Parker, Robert T. Andrews, Thomas P. Marinis, Jr., Washington, D. C., for respondent.

### ORDER

SIRICA, Chief Judge.

This matter having come before the Court on motion of the Watergate Special Prosecutor made on behalf of the June 1972 grand jury of this district for an order to show cause, and the Court being advised in the premises, it is by the Court this 29th day of August, 1973, for the reasons stated in the attached opinion,

Ordered that respondent, President Richard M. Nixon, or any subordinate officer, official or employee with custody or control of the documents or objects listed in the grand jury subpoena *duces tecum* of July 23, 1973, served on respondent in this district, is hereby commanded to produce forthwith for the Court's examination *in camera*, the subpoenaed documents or objects which have not heretofore been produced to the grand jury; and it is

Further ordered that the ruling herein be stayed for a period of five days in which time respondent may perfect an appeal from the ruling; and it is

Further ordered that should respondent appeal from the ruling herein, the above stay will be extended indefinitely pending the completion of such appeal or appeals.

### OPINION

On July 23, 1973, Watergate Special Prosecutor Archibald Cox acting on behalf of the June 1972 grand jury empanelled by this court, caused to be issued a subpoena duces tecum to the President of the United States, Richard M. Nixon.[1] The subpoena required the President, or any appropriate subordinate official, to produce for the grand jury certain tape recordings and documents enumerated in an attached schedule. The President complied with the subpoena insofar as it related to memoranda of Gordon Strachan and W. Richard Howard, but otherwise declined to follow the subpoena's directives. In a letter to the Court dated July 25, 1973, the President advised that the tape recordings sought would not be provided, and by way of explanation wrote:

. . . I follow the example of a long line of my predecessors as President of the United States who have consistently adhered to the position that the President is not subject to compulsory process from the courts.

Thereafter, the grand jury instructed Special Prosecutor Cox to apply for an order requiring production of the recordings. On July 26, the Special Prosecutor petitioned this Court[2] for a show cause order directed to the President.

1. The Special Prosecutor has been designated as the attorney for the Government to conduct proceedings before the grand jury investigating the unauthorized entry into the Democratic National Committee Headquarters and related offenses. Order of the Attorney General No. 517–73, 38 Fed.Reg. 14688 (June 4, 1973). A grand jury subpoena *duces tecum* was issued by the clerk under seal of the court. F.R. Crim.P. 17(a), (c). The Special Prosecutor appears before the Court on behalf of and under the specific authorization of the grand jury, seeking compliance with the subpoena (Transcript of Hearing of July 26, 1973, on Petition for Order to Show Cause 8–12). In this capacity he appears as an officer of the Court and counsel for the grand jury, in addition to being the attorney for the United States.

2. Local Rule 3–6 provides:
 In addition to the trial of such cases as he may undertake and other duties provided by these rules, the Chief Judge shall:
 (3) empanel the grand jury and hear and determine all matters relating to proceedings before the grand jury.

At the time of this application a quorum of the grand jury was polled in open court, and each juror expressed his or her desire that the Court order compliance. Subsequently, the Court ordered that the President or any appropriate subordinate official show cause "why the documents and objects described in [the subpoena] should not be produced as evidence before the grand jury."

In response to the show cause order, the President, by his attorneys, filed a special appearance contesting the Court's jurisdiction to order the President's compliance with the grand jury subpoena.[3] The Court allowed for the filing of a response by the Special Prosecutor and reply by the President, and the matter came on for hearing on August 22nd.

The parties to the controversy have briefed and argued several issues including the Court's jurisdiction in the matter of compulsory process, the existence and scope of "executive privilege" generally, applicability of "executive privilege" to the tape recordings subpoenaed, and waiver of privilege. The Court has found it necessary to adjudicate but two questions for the present: (1) whether the Court has jurisdiction to decide the issue of privilege, and (2) whether the Court has authority to enforce the subpoena *duces tecum* by way of an order requiring production for inspection *in camera*. A third question, whether the materials are in fact privileged as against the grand jury, either in whole or in part, is left for subsequent adjudication. For the reasons outlined below, the Court concludes that both of the questions considered must be answered in the affirmative.

I

A search of the Constitution and the history of its creation reveals a general disfavor of government privileges, or at least uncontrolled privileges. Early in the Convention of 1787, the delegates cautioned each other concerning the dangers of lodging immoderate power in the executive department.[4] This attitude persisted throughout the Convention, and executive powers became a major topic in the subsequent ratification debates.[5] The Framers regarded the legislative department superior in power and importance to the other two and felt the necessity of investing it with some privileges and immunities, but even here an attitude of restraint, as expressed by James Madison, prevailed:

> Mr. Pinkney moved a clause declaring "that each House should be the judge of the privilege of its own members."

\* \* \* \* \* \*

> Mr. Madison distinguished between the power of Judging of privileges previously & duly established, and the effect of the motion which would give a discretion to each House as to the extent of its own privileges. He suggested that it would be better to make provision for ascertaining by *law*, the privileges of each House, than to allow each House to decide for itself. He suggested also the necessity of considering what privileges ought to be allowed to the Executive.[6] (Emphasis in original)

The upshot of Madison's final suggestion regarding a definition of executive privileges was that none were deemed necessary, or at least that the Constitution need not record any. As Charles Pinckney, the South Carolina delegate, later explained in a Senate speech:

> I assert, that it was the design of the Constitution, and that not only its spirit, but letter, warrant me in the assertion, that it never was intended to give Congress, or either branch,

---

3. No objections to the technical adequacy of the subpoena or service of process have been raised.

4. See *e. g.*, 1 Farrand, The Records of the Federal Convention of 1787, 64–69 (1967).

5. The Federalist Nos. 67–77, J. E. Cooke, ed., The Federalist, 452–521 (1961).

6. 2 Farrand, The Records of the Federal Convention of 1787, 502, 503 (1967).

any but specified, and those very limited, privileges indeed. They well knew how oppressively the power of undefined privileges had been exercised in Great Britain, and were determined no such authority should ever be exercised here. They knew that in free countries very few privileges were necessary to the undisturbed exercise of legislative duties, and those few only they determined that Congress should possess; they never meant that the body who ought to be the purest, and the least in want of shelter from the operation of laws equally affecting all their fellow citizens, should be able to avoid them; they therefore not only intended, but did confine their privileges within the narrow limits mentioned in the Constitution.

. . . Let us inquire, why the Constitution should have been so attentive to each branch of Congress, so jealous of their privileges, and have shewn [sic] so little to the President of the United States in this respect. . . . No privilege of this kind was intended for your Executive, nor any except that which I have mentioned for your Legislature. The Convention which formed the Constitution well knew that this was an important point, and no subject had been more abused than privilege. They therefore determined to set the example, in merely limiting privilege to what was neces-

sary and no more.[7] (Ellipsis in original)

 Pinckney's words just quoted, "They therefore determined to set the example, in merely limiting privilege to what was necessary and no more," constitute an apt description of the Convention's purpose and outlook. Are there, then, any rights or privileges consistent with, though not mentioned in, the Constitution which are necessary to the Executive? One answer may be found in the Supreme Court decision, United States v. Reynolds, 345 U.S. 1, 73 S.Ct. 528, 97 L.Ed. 727 (1953). The Court recognized an executive privilege, evidentiary in nature, for military secrets. *Reynolds* held that when a court finds the privilege is properly invoked under the appropriate circumstances, it will, in a civil case at least, suppress the evidence. Thus, it must be recognized that there can be executive privileges that will bar the production of evidence. The Court is willing here to recognize and give effect to an evidentiary privilege based on the need to protect Presidential privacy.[8]

 The Court, however, cannot agree with Respondent that it is the Executive that finally determines whether its privilege is properly invoked. The availability of evidence including the validity and scope of privileges, is a judicial decision.

Judicial control over the evidence in a case cannot be abdicated to the caprice of executive officers.[9]

---

7. 3 Farrand, The Records of the Federal Convention of 1787, 384, 385 (1967). See also, 2 Elliot's Debates, 480 (1836).

8. The Court agrees with Respondent that Presidential privacy, in and of itself, has no merit. Its importance and need of protection arise from "the paramount need for frank expression and discussion among the President and those consulted by him in the making of Presidential decisions." Brief in Opposition at 3. This comports with the court's statement in Kaiser Aluminum & Chemical Corp. v. United States, 157 F.Supp. 939, 944, 141 Ct.Cl. 38 (1958) that the executive privilege is granted "for the benefit of the public, not

of executives who may happen to then hold office."

9. United States v. Reynolds, 345 U.S. 1, 10, 11, 73 S.Ct. 528, 533, 97 L.Ed. 727 (1953). For the courts to abdicate this role to Presidents or anyone else, to make each officer the judge of his own privilege, would dishonor the genius of our constitutional system and breed unbearable abuse. Respondent maintains that an adequate remedy for abuse is provided in the impeachment power. Impeachment may be the final remedy, but it is not so designed that it can function as a deterrent in any but the most excessive cases. The argument overlooks the many possible

It is emphatically the province and duty of the judicial department to say what the law is. Those who apply the rule, to particular cases must of necessity expand and interpret that rule. If two laws conflict with each other, the courts must decide on the operation of each.[10]

In all the numerous litigations where claims of executive privilege have been interposed, the courts have not hesitated to pass judgment.[11] Executive fiat is not the mode of resolution.[12] As has been stated most recently in this Circuit:

[N]o executive official or agency can be given absolute authority to determine what documents in his possession may be considered by the court in its task. Otherwise the head of an executive department would have the power on his own say so to cover up all evidence of fraud and corruption when a federal court or grand jury was investigating malfeasance in office, and this is not the law.[13]

The measures a court should adopt in ruling on claims of executive privilege are discussed under Part III herein.

## II

■ If after judicial examination *in camera,* any portion of the tapes is ruled not subject to privilege, that portion will be forwarded to the grand jury at the appropriate time. To call for the tapes *in camera* is thus tantamount to fully enforcing the subpoena as to any unprivileged matter. Therefore, before the Court can call for production *in camera,* it must have concluded that it has authority to order a President to obey the command of a grand jury subpoena as it relates to unprivileged evidence in his possession. The Court has concluded that it possesses such authority.

■ Analysis of the question must begin on the well established premises that the grand jury has a right to every man's evidence and that for purposes of gathering evidence, process may issue to anyone.

The court can perceive no legal objection to issuing a subpoena *duces tecum* to any person whatever, provided the case be such as to justify the process.[14]

The important factors are the relevance and materiality of the evidence.

The propriety of introducing any paper into a case, as testimony, must depend on the character of the paper, not on the character of the person who holds it.[15]

The burden here then, is on the President to define exactly what it is about

---

situations in which only a few may suffer the consequences of abuse; situations where impeachment is not a reasonable solution. The Court intends no suggestion that Respondent could not be trusted as his own judge in matters of privilege, but it would hesitate to set a precedent, in contravention of basic constitutional principles, that might permit or encourage some future high executive officer to become a despot.

10. Marbury v. Madison, 1 Cranch 137, 177, 2 L.Ed. 60 (1803).

11. See *e. g.,* the cases and authorities cited at 8 Wright & Miller, Federal Practice and Procedure, 167–173 (1970).
 These statements are not represented as necessarily accurate where an executive privilege is asserted in opposition to Congressional demands for information.

12. While it is true that Attorneys General have never hesitated to claim an uncontrolled executive discretion in this area, such opinions usually come in response to Congressional demands for information, and therefore have little relevance to the present issue. Insofar as they may have any bearing here, however, assertions that the courts have stamped their approval on this doctrine of absolutism should not be left unchallenged. Such claims rest on unsteady foundations. See *e. g.,* Bishop, The Executive's Right of Privacy: An Unresolved Constitutional Question, 66 Yale L.J., 477, 478, n. 5 (1957).

13. Committee for Nuclear Responsibility, Inc. v. Seaborg, 149 U.S.App.D.C. 385, 463 F.2d 788 (1971).

14. United States v. Burr, 25 Fed.Cas. pp. 30, 35 (Case No. 14,692d) (1807).

15. *Id.* at 34.

his office [16] that court process commanding the production of evidence cannot reach there. To be accurate, court process in the form of a subpoena *duces tecum* has already issued to the President, and he acknowledges that pursuant to *Burr*, courts possess authority to direct such subpoenas to him. A distinction is drawn, however, between authority to issue a subpoena and authority to command obedience to it. It is this second compulsory process that the President contends may not reach him.[17] The burden yet remains with the President, however, to explain why this must be so. What distinctive quality of the Presidency permits its incumbent to withhold evidence? To argue that the need for Presidential privacy justifies it, is not persuasive. On the occasions when such need justifies suppression, the courts will sustain a privilege. The fact that this is a judicial decision has already been discussed at length, but the opinion of Chief Justice Marshall on the topic deserves notice here. When deciding that a subpoena should issue to the President, the Chief Justice made it clear that if certain portions should be excised, it being appropriate to sustain a privilege, the Court would make such a decision upon return of the subpoena.

There is certainly nothing before the court which shows that the letter in question contains any matter the disclosure of which would endanger the public safety. If it does contain such matter, the fact may appear before the disclosure is made. If it does contain any matter which it would be imprudent to disclose, which it is not the wish of the executive to disclose, such matter, *if it be not immediately and essentially applicable to the point, will, of course, be suppressed.* It is not easy to conceive that so much of the letter as relates to the conduct of the accused can be a subject of delicacy with the president. *Everything of this kind, however, will have its due consideration on the return of the subpoena.*[18]

And again:

The propriety of requiring the answer to this letter is more questionable. It is alleged that it most probably communicates orders showing the situation of this country with Spain, which will be important on the misdemeanor. *If it contain matter not essential to the defence, and the disclosure be unpleasant to the executive, it certainly ought not to be disclosed. This is a point which will appear on the return.*[19]

---

16. No claim is made for the President, nor can it be, that apart from his office, he is immune from the obligations of subpoenas and court orders.

17. In oral argument, the Court put a hypothetical situation to the President's counsel regarding the production of unprivileged evidence. Counsel responded as follows:

MR. WRIGHT: On the set of facts that Your Honor puts, the President would have no privilege, since you have hypothesized the President obtained the evidence wholly independent of any official duties. I must say that in my submission a court would lack power, nevertheless, to compel the President to produce the evidence so long as he remains President. I cannot concede that a court has power to issue compulsory process to an incumbent President of the United States. (Misc. 47–73, Transcript of Proceedings, August 22, 1973, at 16, 17.)

It is certainly arguable that a subpoena is compulsory process as well as any subsequent order mandating production either *in camera* or to a grand jury. Be that as it may, the Court recognizes a distinction between issuing a subpoena to the President and commanding that he honor it.

18. United States v. Burr, *supra*, n. 14, at 37. President Jefferson, upon forwarding the subpoenaed letter to Mr. Hay, counsel for the United States, authorized Hay to excise those portions of the letter "not material for the purposes of justice." Mr. Hay was willing to refer the "accuracy" of his opinion on that matter "to the judgment of the court, by submitting the original letter to its inspection." United States v. Burr, 25 Fed.Cas. pp. 187, 190 (Case No. 14,694) (1807).

19. *Id.*

To argue that it is the constitutional separation of powers that bars compulsory court process from the White House, is also unpersuasive. Such a contention overlooks history. Although courts generally, and this Court in particular,[20] have avoided any interference with the discretionary acts of coordinate branches, they have not hesitated to rule on non-discretionary acts when necessary.[21] Respondent points out that these and other precedents refer to officials other than the President, and that this distinction renders the precedents inapplicable. Such an argument tends to set the White House apart as a fourth branch of government. It is true that Mississippi v. Johnson, 4 Wall. 475, 18 L. Ed. 437 (1866) left open the question whether the President can be required by court process to perform a purely ministerial act, but to persist in the opinion, after 1952, that he cannot would seem to exalt the form of the *Youngstown Sheet & Tube Co.* case over its substance.[22] Though the Court's order there went to the Secretary of Commerce, it was the direct order of President Truman that was reversed.

The Special Prosecutor has correctly noted that the Framers' intention to lodge the powers of government in separate bodies also included a plan for interaction between departments. A "watertight" division of different functions was never their design. The legislative branch may organize the judiciary[23] and dictate the procedures by which it transacts business.[24] The judiciary may pass upon the constitutionality of legislative enactments[25] and in some instances define the bounds of Congressional investigations.[26] The executive may veto legislative enactments,[27] and

20. See In Re Application of the Senate Select Committee (DCDC 1973), Misc. No. 70–73 (June 12, 1973).

21. See e. g., United States v. United States Dist. Ct., 407 U.S. 297, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972); Powell v. McCormack, 395 U.S. 486, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969); Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1952); D.C. Federation of Civic Assn's v. Volpe, 316 F.Supp. 754, 760, n. 12 (DCDC 1970).

Discretionary duties and acts are not at issue here. The grand jury does not ask that the Court command or forbid the performance of any discretionary functions. The President is not asked to account in any way for the conduct of his office. The questions here concern the obligation of the President to provide evidence, something more akin to a ministerial duty if indeed it concerns official duties at all.

Nor is this a case, as Respondent suggests, where the Court in deciding the applicability of privilege, substitutes its judgment for that of the President on a matter committed to Presidential discretion, the public interest. Where a court, for example, determines whether probable cause existed for an arrest, it does not substitute its judgment for that of the arresting officer. A judge simply decides whether the condition is met, whether there were reasonable grounds. He does not decide whether he would have arrived at the same conclusion as the officer did on the need to arrest. Here, the Court must determine whether the conditions for privilege exist. Should it so find, it does not then judge the wisdom of withholding evidence in the public interest.

An attempt to dictate to or require an account of the President in the discretionary matters committed to him under Article II would truly be an instance of one branch pitting itself against another. Such is not the case here.

22. Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1952).

23. United States Constitution, Article III, Section 1.

24. See e. g., 28 U.S.C. §§ 2, 44(c), 144, 1731–1745, 2403; 18 U.S.C. §§ 2519, 3331(a), 6003(a).

25. Marbury v. Madison, 1 Cranch 137, 2 L.Ed. 60 (1803).

26. See e. g., Barenblatt v. United States, 360 U.S. 109, 79 S.Ct. 1081, 3 L.Ed.2d 1115 (1959); United States v. Rumely, 345 U.S. 41, 73 S.Ct. 543, 97 L.Ed. 770 (1953); Sinclair v. United States, 279 U.S. 263, 49 S.Ct. 268, 73 L.Ed. 692 (1929).

27. United States Constitution, Article I, Section 7.

the legislature may override the veto.[28] The executive appoints judges and justices [29] and may bind judicial decisions by lawful executive orders.[30] The judiciary may pass on the constitutionality of executive acts.[31]

While the Constitution diffuses power the better to secure liberty, it also contemplates that practice will integrate the dispersed powers into a workable government. It enjoins upon its branches separateness but interdependence, autonomy but reciprocity.[32]

That the Court has not the physical power to enforce its order to the President is immaterial to a resolution of the issues. Regardless of its physical power to enforce them, the Court has a duty to issue appropriate orders.[33] The Court cannot say that the Executive's persistence in withholding the tape recordings would "tarnish its reputation," but must admit that it would tarnish the Court's reputation to fail to do what it could in pursuit of justice.[34] In any case, the courts have always enjoyed the good faith of the Executive Branch, even in such dire circumstances as those presented by Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1952), and there is no reason to suppose that the courts in this instance cannot again rely on that same good faith. Indeed, the President himself has publicly so stated.

It is important also to note here the role of the grand jury. Chief Justice Marshall, in considering whether a subpoena might issue to the President of the United States observed:

In the provisions of the constitution, and of the statute, which give to the accused a right to the compulsory process of the court, there is no exception whatever.[35]

Aaron Burr, it will be remembered, stood before the court accused though not yet indicted. The Chief Justice's statement regarding the accused is equally true with regard to a grand jury: "there is no exception whatever" in its right to the compulsory process of the courts. The Court, while in a position to lend its process in assistance to the grand jury, is thereby in a position to assist justice.

The grand jury is well known to Anglo-American criminal justice as the people's guardian of fairness. Ever since the Earl of Shaftesbury relied upon its integrity, the grand jury has been promoted as a shield for the innocent and a sword against the guilty.[36] Among the Bill of Rights enacted by the First Congress was the Fifth Amendment which reads in part: "No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury." The grand jury derives its authority directly from the people,[37] and

28. *Id.*

29. United States Constitution, Article II, Section 2.

30. See *e. g.*, Environmental Protection Agency v. Mink, 410 U.S. 73, 93 S.Ct. 827, 35 L.Ed.2d 119 (1973).

31. See *e. g.*, United States v. United States Dist. Ct., 407 U.S. 297, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972).

32. Youngstown Sheet & Tube Co. v. Sawyer, *supra*, n. 22.

33. See Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962).

34. See United States v. Burr, *supra*, n. 14, at 37. In the words of the Chief Justice:
It cannot be denied that to issue a subpoena to a person filling the exalted position of the chief magistrate is a duty which would be dispensed with more cheerfully than it would be performed; but, if it be a duty, the court can have no choice in the case. United States v. Burr, 25 Fed.Cas. pp. 30, 34 (Case No. 14,692d) (1807).

35. United States v. Burr, *supra*, n. 14, at 34.

36. For a full exposition of the purpose and role of grand juries see Branzburg v. Hayes, 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972).

37. Hale v. Henkel, 201 U.S. 43, 61, 26 S.Ct. 370, 50 L.Ed. 652 (1906); In Re April 1956 Term Grand Jury, 239 F.2d 263, 269 (7th Cir. 1956).

when that group, independent in its sphere, acts according to its mandate, the court cannot justifiably withhold its assistance, nor can anyone, regardless of his station, withhold from it evidence not privileged.[38] Marshall concluded that, contrary to the English practice regarding the King, the laws of evidence do not excuse anyone because of the office he holds.[39]

. . . The single reservation alluded to is the case of the king. Although he may, perhaps, give testimony, it is said to be incompatible with his dignity to appear under the process of the court. Of the many points of difference which exist between the first magistrate in England and the first magistrate of the United States, in respect to the personal dignity conferred on them by the constitutions of their respective nations, the court will only select and mention two. It is a principle of the English constitution that the king can do no wrong, that no blame can be imputed to him, that he cannot be named in debate. By the constitution of the United States, the president, as well as any other officer of the government, may be impeached, and may be removed from office on high crimes and misdemeanors. By the constitution of Great Britain, the crown is hereditary, and the monarch can never be a subject. By that of the United States, the president is elected from the mass of the people, and, on the expiration of the time for which he is elected, returns to the mass of the people again. How essentially this difference of circumstances must vary the policy of the laws of the two countries, in reference to the personal dignity of the executive chief, will be perceived by every person.[40]

In all candor, the Court fails to perceive any reason for suspending the power of courts to get evidence and rule on questions of privilege in criminal matters simply because it is the President of the United States who holds the evidence. The *Burr* decision left for another occasion a ruling on whether compulsory process might issue to the President in situations such as this. In the words of counsel, "this is a new question," with little in the way of precedent to guide the Court. But Chief Justice Marshall clearly distinguished the amenability of the King to appear and give testimony under court process and that of this nation's chief magistrate.[41] The conclusion reached here cannot be inconsistent with the view of that great Chief Justice nor with the spirit of the Constitution.

## III

■ In deciding whether these tape recordings or portions thereof are properly the objects of a privilege, the Court

38. Sullivan v. United States, 348 U.S. 170, 75 S.Ct. 182, 99 L.Ed. 210 (1954); United States v. United States Dist. Ct., 238 F.2d 713 (4th Cir. 1956), cert. denied, 352 U.S. 981, 77 S.Ct. 382, 1 L.Ed.2d 365 (1957); In Re Miller, 17 Fed.Cas. p. 295 (Case No. 9,552) (1878); In Re Times Mirror Company, 354 F.Supp. 208 (DCDC 1972).

39. The practical obstacles to compliance alluded to by Chief Justice Marshall in the Burr case are not a factor here. At page 34 the Chief Justice wrote:

If, upon any principle, the president could be construed to stand exempt from the general provisions of the constitution, it would be, because his duties as chief magistrate demand his whole time for national objects. United States v. Burr, 25 Fed.Cas. pp. 30, 34 (Case No. 14,692d) (1807).

The President here need not respond in person to the subpoena inasmuch as it is directed to "Richard M. Nixon, *or* Any Subordinate Officer, Official, or Employee with Custody or Control of Certain Documents or Objects." The Court is advised that the tape recordings have previously been entrusted to the custody of others and no reason appears why they could not again be held in the possession of a subordinate official for purposes of answering the Court's order.

40. United States v. Burr, *supra*, n. 14 at 34.

41. Id.

must accommodate two competing policies. On the one hand, as has been noted earlier, is the need to disfavor privileges and narrow their application as far as possible. On the other hand, lies a need to favor the privacy of Presidential deliberations; to indulge a presumption in favor of the President. To the Court, respect for the President, the Presidency, and the duties of the office, gives the advantage to this second policy. This respect, however, does not decide the controversy. Such a resolution on the Court's part, as Chief Justice Marshall observed, "would deserve some other appellation than the term respect." [42] Nevertheless, it does not hurt for the courts to remind themselves often that the authority vested in them to delimit the scope and application of privileges, particularly the privileges and immunities of government, is a trust. And as with every trust, an abuse can reap the most dire consequences. This Court, then, enters upon its present task with care and with a determination to exercise the restraint that characterizes the conduct of courts.

The teaching of *Reynolds* is that a court should attempt to satisfy itself whether or not a privilege is properly invoked without unnecessarily probing into the material claimed to be privileged. [43] A decision on how far to go will be dictated in part by need for the evidence.

In each case, the showing of necessity which is made will determine how far the court should probe in

satisfying itself that the occasion for invoking the privilege is appropriate. Where there is a strong showing of necessity, the claim of privilege should not be lightly accepted, but even the most compelling necessity cannot overcome the claim of privilege if the court is ultimately satisfied that military secrets are at stake. A fortiori, where necessity is dubious, a formal claim of privilege, made under the circumstances of this case, will have to prevail. [44]

The grand jury's showing of need here is well documented and imposing. The Special Prosecutor has specifically identified by date, time and place each of the eight meetings and the one telephone call involved. Due to the unusual circumstances of having access to sworn public testimony of participants to these conversations, the Special Prosecutor has been able to provide the Court with the conflicting accounts of what transpired. He thus identifies the topics discussed in each instance, the areas of critical conflict in the testimony, and the resolution it is anticipated the tape recordings may render possible. [45] The relative importance of the issues in doubt is revealed. One example, quoted from the Special Prosecutor will suffice:

*Meeting of September 15, 1972.* On September 15, 1972, the grand jury returned an indictment charging seven individuals with conspiracy and other offenses relating to the break-in. Respondent met the same day with Dean and Haldeman in his Oval

---

42. Id.

43. United States v. Reynolds, 345 U.S. 1, 10, 73 S.Ct. 528, 97 L.Ed. 727 (1953).

44. *Id.* at 11, 73 S.Ct. at 533.
 Occasionally when the executive privilege question comes before a court, need for the evidence cannot be termed great because it is possible to indirectly satisfy the need without breaching the privilege claimed. This is accomplished in criminal cases, for example, by requiring the government to choose between foregoing its prosecution or coming forward with

the information claimed to be privileged. Whichever choice the government makes does justice to the defendant. In addition the situation creates an incentive for the government to critically evaluate its claim of privilege. Compare Vaughn v. Rosen, 484 F.2d 820 at 825, 826 (D.C.Cir.1973). This case, however, is more akin to those arising under the Freedom of Information Act, 5 U.S.C. § 552. There, as here, the party petitioning access to information gains absolutely nothing from dismissal of the action. The question of need must be directly confronted.

45. See Brief in Support at 10, 11.

Office from 5:37 to 6:17 p. m. Both Dean and Haldeman have given lengthy but contradictory accounts of what was said (S.Tr. 2229–33, 6090–93).

According to Dean, the purpose of the meeting was to brief respondent on the status of the investigation and related matters. Dean said that respondent then congratulated him on the "good job" he had done and was pleased that the case had "stopped with Liddy." Dean said that he then told respondent that all he had been able to do was "contain" the case and "assist in keeping it out of the White House." (S.Tr. 2230.) If this testimony is corroborated, it will tend to establish that a conspiracy to obstruct justice reached the highest level of government.

Haldeman, after reviewing a tape recording of the meeting, has agreed that there was discussion of the Watergate indictments, of the civil cases arising out of the break-in, of the possibility of a continuing grand jury investigation, of internal politics at the Committee for the Re-Election of the President, and of other matters. He denies, however, that respondent congratulated Dean on Dean's efforts to thwart the investigation. (S.Tr. 6090–93, 6456.)

If Haldeman's innocuous version of the meeting can be sustained, it is because the meeting only involved an innocent discussion of political interests. The question of Dean's perjury would then arise. Resolution of this conflict between two of the three persons present and an accurate knowledge of plans or admissions made on this occasion would be of obvious aid to the grand jury's investigation.[46]

The point is raised that, as in *Reynolds*, the sworn statements of witnesses should suffice and remove the need for access to documents deemed privileged. Though this might often be the case, here, unfortunately, the witnesses differ, sometimes completely, on the precise matters likely to be of greatest moment to the grand jury. Ironically, need for the taped evidence derives in part from the fact that witnesses *have* testified regarding the subject matter, creating important issues of fact for the grand jury to resolve. It will be noted as well in contradistinction to *Reynolds*, that this is a criminal investigation. Rather than money damages at stake, we deal here in matters of reputation and liberty. Based on this indisputably forceful showing of necessity by the grand jury, the claim of privilege cannot be accepted lightly.

In his Brief in Support, the Special Prosecutor outlines the grand jury's view regarding the validity of the Respondent's claim of privilege. Its opinion is that the right of confidentiality is improperly asserted here. Principally, the Special Prosecutor cites a substantial possibility, based on the sworn testimony of participants, that the privilege is improperly invoked as a cloak for serious criminal wrongdoing.

According to the testimony of John W. Dean, many of the conversations in which he participated were part and parcel of a criminal conspiracy to obstruct justice by preventing the truth from coming out about the additional participants in the original conspiracy to break into and wiretap the offices of the Democratic National Committee. He has testified that in the presence of H. R. Haldeman he told respondent on September 15, 1972, that "all [Dean] had been able to do was to contain the case and assist in keeping it out of the White House." Dean also told respondent that he "could make no assurances that the day would not come when this matter would start to unravel." Respondent allegedly congratulated him on the "good job" he was doing on that task. (S.Tr. 2229–30). Dean also has testified that on March 13, 1973, respondent told him that respondent had approved executive clemency for Hunt and that there

46. See Brief in Support at 6, 7.

would be no problem in raising $1 million to buy the Watergate defendants' silence (S.Tr. 2324). In addition, there is uncontradicted testimony that respondent was briefed on Watergate on June 20, 1972, three days after the arrests, by Haldeman, Ehrlichman and Mitchell, his closest political advisors (S.Tr. 5924, 3407–08). If these three told respondent all they allegedly knew, respondent would have been aware of details of the nascent cover-up.

It is true, of course that other testimony indicates that the conversations did not include direct evidence of criminal misconduct. While this is not the time or place to judge credibility, Dean's testimony cannot be dismissed out of hand. In fact, Haldeman has confirmed many of the details of the meetings at which both he and Dean were present. The opposite conclusions he draws are based upon a different interpretation and different recollection of some of the details.[47]

■ If the interest served by a privilege is abused or subverted, the claim of privilege fails. Such a case is well described in Clark v. United States, 289 U.S. 1, 53 S.Ct. 465, 77 L.Ed. 993 (1933), a decision involving the privilege of secrecy enjoyed by jurors.

The privilege takes as its postulate a genuine relation, honestly created and honestly maintained. If that condition is not satisfied, if the relation is merely a sham and a pretense, the juror may not invoke a relation dishonestly assumed as a cover and cloak for the concealment of the truth.

\* \* \* \* \* \*

With the aid of this analogy [to the attorney-client privilege] we recur to the social policies competing for supremacy. A privilege surviving until the relation is abused and vanishing when abuse is shown to the satisfaction of the judge has been found to be a workable technique for the protection of the confidences of client and attorney. Is there sufficient reason to believe that it will be found to be inadequate for the protection of a juror? No doubt the need is weighty that conduct in the jury room shall be untrammeled by the fear of embarrassing publicity. The need is no less weighty that it shall be pure and undefiled. A juror of integrity and reasonable firmness will not fear to speak his mind if the confidences of debate are barred to the ears of mere impertinence or malice. He will not expect to be shielded against the disclosure of his conduct in the event that there is evidence reflecting upon his honor.[48]

These principles are, of course, fully applicable throughout government.[49] A court would expect that if the privacy of its deliberations, for example, were ever used to foster criminal conduct or to develop evidence of criminal wrongdoing, any privilege might be barred and privacy breached. So it is that evidentiary privileges asserted against the grand jury may be ruled inapplicable if the interest served by the privilege is subverted.

■ Nevertheless, without discrediting the strength of the grand jury's position, the Court cannot, as matters now stand, rule that the present claim of privilege is invalid. The President contends that the recorded conversations occurred pursuant to an exercise of his duty to "take care that the laws be faithfully executed."[50] Although the Court is not bound by that conclusion, it is extremely reluctant to finally stand against a declaration of the President of the

---

47. See Brief in Support at 48, 49.

48. Clark v. United States, 289 U.S. 1, 14, 16, 53 S.Ct. 465, 469, 470, 77 L.Ed. 993 (1933).

49. See e. g., Gravel v. United States, 408 U.S. 606, 92 S.Ct. 2614, 33 L.Ed.2d 583 (1972); United States v. Brewster, 408 U.S. 501, 92 S.Ct. 2531, 33 L.Ed.2d 507 (1972); Spalding v. Vilas, 161 U.S. 483, 498, 16 S.Ct. 631, 40 L.Ed. 780 (1896); Bivens v. Six Unknown Narcotics Agents, 456 F.2d 1339 (2nd Cir. 1972).

50. United States Constitution, Article II, Section 3.

United States on any but the strongest possible evidence. Need for the evidence requires that a claim not be accepted lightly, but the vitality of Presidential deliberations in like manner requires that the claim not be rejected lightly. The Court is simply unable to decide the question of privilege without inspecting the tapes.

■ It is true that if material produced is properly the subject of privilege, even an inspection *in camera* may constitute a compromise of privilege. Nevertheless, it would be an extremely limited infraction and in this case an unavoidable one. If privileged and unprivileged evidence are intermingled, privileged portions may be excised so that only unprivileged matter goes before the grand jury (which also meets in secret proceedings). If privileged and unprivileged evidence are so inextricably connected that separation becomes impossible, the whole must be privileged and no disclosure made to the grand jury.

It should be observed as well that given the circumstances in this case, there is every reason to suppose an *in camera* examination will materially aid the Court in its decision. The fact that extensive accounts of the recorded conversations given under oath by participants are available, will enable the Court to make an intelligent and informed analysis of the evidence.

The Court is unable to design a more cautious approach consistent with both the demonstrated critical need for the evidence and the serious questions raised concerning the applicability of the privilege asserted. The Court has attempted to walk the middle ground between a failure to decide the question of privilege at one extreme, and a wholesale delivery of tapes to the grand jury at the other. The one would be a breach of duty; the other an inexcusable course of conduct. The approach comports with precedent in this district,[51] and honors the injunction of *Reynolds* and *Burr* to pursue fairness and protect essential privacy.[52]

To paraphrase Chief Justice Marshall,[53] if it be apparent that the tapes are irrelevant to the investigation, or that for state reasons they cannot be introduced into the case, the subpoena *duces tecum* would be useless. But if this be not apparent, if they *may* be important in the investigation, if they *may* be safely heard by the grand jury, if only in part, would it not be a blot on the page which records the judicial proceedings of this country, if, in a case of such serious import as this, the Court did not at least call for an inspection of the evidence in chambers?

51. Nader v. Butz, C.A.No.148–72 (DCDC August 20, 1973).

52. The President urges that a production order from the Court would open the floodgates to innumerable subpoenas. The above procedure is designed to prevent such a result. It should be noted as well that this is apparently the first time since the *Burr* decision in 1807 that a subpoena of this sort has been directed to the President. If we may rely on history, there is little indication that the President will be subjected to the "parade of horrors" he describes.
 Chief Justice Marshall was sensitive to the need to protect the President against abuse that would employ judicial process to gain its end:
 The guard, furnished to this high officer, to protect him from being harassed by vexatious and unnecessary subpoenas, is to be looked for in the conduct of a court after those subpoenas have issued; not in any circumstance which is to precede their being issued. United States v. Burr, *supra*, n. 14 at 34.
 Later in the pretrial proceedings, the Chief Justice had occasion to elaborate on the judicial procedures that might be useful as presidential "guards". The passage is too lengthy for an exposition here, but interested persons are referred to United States v. Burr, 25 Fed.Cas. pp. 187, 191, 192 (Case No. 14,694) (1807). The Court has here attempted to implement the Chief Justice's guidelines.

53. United States v. Burr, *supra*, n. 14 at 35.